**CHESTER B. BROWN CO., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 0187.**

United States District Court
D. Nebraska.

June 19, 1957.

Young, Holm & Miller (K. B. Holm), Omaha, Neb., for plaintiff.

James P. Garland and William A. Miner, Dept. of Justice, Washington, D. C., William C. Spire, U. S. Atty., Omaha, Neb., and Robert H. Berkshire, Asst. U. S. Atty., Lincoln, Neb., for defendant.

ROBINSON, Chief Judge.

This and a companion case, Scottsbluff Bean & Elevator Co. v. U. S. A. (Civil 0188), are suits to recover federal unemployment taxes paid by the taxpayers for the calendar years 1951 and 1952. The two cases involve substantially identical legal questions, permitting the ruling herein to apply in both instances. Essentially, the problem is to determine whether the taxpayers' warehouse employees [1] are agricultural labor, or come within the definition thereof as set out in the statute,[2] for if they are, or should they come within it, the taxpayers would be exempt from the tax imposed by the Federal Unemployment Tax Act. See 26 U.S.C.A. § 1600 et seq., I.R.C.1939.

The parties to the present suit have filed a stipulation of facts, wherein the operations of the Chester B. Brown Co. have been set out at length. (The stipulation is attached in the Appendix.) Inasmuch as there is no controversy as to any material fact, it is considered unnecessary to review those operations here. Ordinarily, then, our task would be limited to determining whether the character of the work entailed is encompassed by the definition of agricultural labor. In our judgment it is, but in this instance such a decision will not compose the essential differences of the parties. Another factor remains for our consideration, namely, the character of the employer. It appears to be the government's position, taking its cue from the ruling in Miller v. Burger, 9 Cir., 161 F.2d 992, that operations performed upon beans and peas sold to the taxpayer by the farmer-producer, or indeed which are owned by any party other than the farmer himself, are not exempt, which in effect serves to exclude the employees of a commercial handler from the classification of agricultural labor. We disagree. From our reading of the Act and the current tax rulings, we are persuaded that not only is such a distinction in status not justified, but assuming arguendo that it were, it would be inapplicable in the situation now before the Court.

The Act requires that the processing operations be "incident to the preparation of such * * * vegetables for market" and not "in connection with * * * [the] commodity after its delivery to a terminal market for distribution for consumption". F.U.T.A., § 1607 (*l*) (4). The Commissioner's ruling, in its latest casting, provides that the services of a commercial handler are excepted

---

[1]. The term "warehouse employees" refers only to employees engaged in the actual and physical receipt, weighing, sampling, grading, storing, cleaning, milling, packaging, or bagging, preparing for shipment and delivering for shipment, beans and peas cleaned and processed by the plaintiff. The term does not include executive, clerical, office and similar classes of employees even though such employees are employed in the plaintiff's operations. Stipulation of Facts, paragraph 11.

[2]. "§ 1607. Definitions
"When used in this subchapter—
* * * * *
"(*l*) Agricultural labor. The term 'agricultural labor' includes all service performed—
* * * * *

"(4) In handling, planting, drying, packing, packaging, processing, freezing, grading, storing, or delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultural commodity; but only if such service is performed as an incident to ordinary farming operations or, in the case of fruits or vegetables, as an incident to the preparation of such fruits or vegetables for market. The provisions of this paragraph shall not be deemed to be applicable with respect to service performed in connection with commercial canning or commercial freezing or in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption. * * *"

26 U.S.C.A. § 1607 (*l*) (4), I.R.C. 1939.

from coverage under the Act "if performed in the handling, packing, packaging, grading, and preparing of such * * * vegetables in their raw or natural state prior to the sale thereof, or delivery thereof for shipment or sale, to a wholesaler or dealer therein". Mim. 6239, CB 1948–1 at 116. It is agreed that the taxpayer is engaged solely in processing beans and peas for edible and seed markets. The vegetables are processed in a "field-run" condition, that is to say, although harvested, they require cleaning before they are ready for market. Certainly, at this juncture they would be appropriately described as in a "raw or natural state". Hence, if nothing else were involved, it would be readily conceded that the operations performed by the taxpayer in processing the vegetables are exempted by the Act.

■■ Any refinements of the statutory test, as may be culled from Mim. 6239, would not alter the taxpayer's situation. Irrespective of whether the taxpayer purchases a quantity of the beans before the actual processing is undertaken (and the record shows that approximately 20–30% of the beans delivered at harvest time are purchased), the point is whether, in the course of such operations, the activities of the taxpayer extend beyond those reasonably associated with the operations of a "first processor". In other words, the test can be stated in terms of, not who owns the beans, but afterwards what does the proprietor do with them. And in this connection, it is only necessary to establish that all of the taxpayer's operations constitute an essential part of the processing function, the sole purpose of which is to ready the commodity for distribution for consumption. We think they do. As stipulated, the beans owned by the taxpayer, after being sorted, graded, and cleaned, are bagged or boxed in varying weights and sold to wholesalers and dealers. Before they can be placed in channels of trade, however, the vegetables require the taxpayer's processing services. Its business, by nature, is not a terminal market. Thus the fact that the taxpayer purchases a quantity of beans prior to their processing would not make it one. Once satisfied that the taxpayer is properly within the area demarcated as "first processing" and not beyond it, by all logic its employees must come within the definition of agricultural labor exempting the employer from the liabilities in question. We so hold.

The cases which the government cites to negative this conclusion are not considered in point. Jones v. Gaylord Guernsey Farms, 10 Cir., 128 F.2d 1008, arose prior to the addition of the definition of "agricultural labor" which is now contained in the Act. The "dominant purpose of the enterprise" and allied factors have been superseded. Baiocchi v. Ewing, D.C., 87 F.Supp. 520, is distinguishable on the facts. The employee involved worked for a terminal market. A like distinction can be drawn with Miller v. Burger, supra, and Ewing v. McLean, 9 Cir., 189 F.2d 887. Minor Walton Bean Co. v. Michigan Unemployment Compensation Commission, 308 Mich. 636, 14 N.W.2d 524, is restricted in application to services performed prior to the time the Michigan Employment Security Law, Pub.Acts 1939, No. 324 was amended, which incorporated the definition of agricultural labor presently contained in F.U.T.A. See Michigan Unemployment Compensation Commission v. Unionville Milling Co., 313 Mich. 292, 21 N.W.2d 135. The remaining cases are of like order and need not be discussed. Furthermore, in the Unionville Milling Co. case the defendant was in a situation comparable to the present taxpayer's, and the court held that the processing operations constituted "agricultural labor" within the meaning of the state law (which itself is comparable to the definition in the F.U.T.A.). It should also be mentioned that the case of Chester B. Brown Co. v. Employment Security Agency, Idaho, 299 P.2d 487, wherein a similar definition of agricultural labor was considered, the Supreme Court of Idaho held the taxpayer's operations exempt. We note our approval.

It may be appropriate to observe that the question involved herein has been extensively considered in a recent annotation of the American Law Reports. See 53 A.L.R.2d 406.

In view of the conclusion that the taxpayer's employees are exempt from the area of covered employment under the Act, the taxpayer is entitled to recover the sum prayed for. Considering that the facts are undisputed and the case was decided on the briefs, the matter will be treated as if it were submitted on a motion for summary judgment. Plaintiff's counsel will, therefore, prepare and submit an order in accordance with the stated ruling. Judgment for $1710.02, with interest and costs.

## Appendix

The following Stipulation of Facts (with exhibits omitted, however) was agreed upon and filed by the parties to this action on February 1, 1957:

"1. Plaintiff, Chester B. Brown Co., is, and was at all times material hereto, a Nebraska corporation having its principal place of business in Morrill, Nebraska.

2. Plaintiff filed its annual Federal tax return of employers of eight or more individuals under the Federal Unemployment Tax Act in the District of Nebraska; Exhibit A which is attached hereto and made a party hereof as fully as if set out herein, is the return for the calendar year 1951 which was properly and timely filed with the District Director of Nebraska and Exhibit B, which is attached hereto and made a part hereof as fully as if set out herein, is the return for the calendar year 1952 which was properly and timely filed with the District Director of Nebraska.

3. Plaintiff maintains places of business at Gering, Morrill, Bayard, Minatare, Lyman, and South Mitchell, Nebraska; and is qualified to do business as a foreign corporation within the States of Wyoming and Idaho and maintains places of business in those states at Lingle and Torrington, Wyoming, and at Rupert and Filer, Idaho. Its business and operations are substantially identical in each of said states.

4. Plaintiff is engaged solely in the processing of beans and peas for edible and seed markets, beans and peas for seed markets, however, being processed only in the State of Idaho. Plaintiff's operations are performed upon beans and peas which may be owned either by the farmer-producer, plaintiff, or by commercial house. The processing performed by plaintiff is identical in all states, except that in Idaho edible beans and seed beans and seed peas are cleaned for commercial houses. There are no seed beans and peas grown in Nebraska and Wyoming, the harvest of Idaho being so far superior for seed purposes as to usurp the seed market.

5. Beans constitute a principal agricultural crop in Western Nebraska and Eastern Wyoming and thousands of acres annually are planted in beans in these areas with a resulting harvest of thousands of tons of beans. The varieties of beans grown in Nebraska and Wyoming are Great Northerns and Pintos. These beans must dry upon the vine before being ready for harvest. When green, they are bitter and inedible and are never harvested until dry. When the beans have reached this state, they are then harvested by combining operation which separates the beans from the pods and delivers them into open bed trucks. The beans are then in what is known as a "field-run condition". In such condition, they contain unseparated pods, portions of pods, stones, dirt and other debris.

6. Field-run beans must be cleaned before they are ready for the consumption market. Beans are received by plaintiff in field-run condition and are thereafter weighed, sampled, graded, stored, cleaned, milled, packaged, prepared for shipment, and delivered to carriers for transportation to terminal markets. The operations performed by plaintiff in no way changes the chemical or physical condition of the beans.

7. When a farmer brings his beans to plaintiff's elevator, plaintiff draws a sam-

ple thereof to determine the percentage of culls and other waste materials which the beans contain, and, whether the beans are then purchased from the farmer or accepted for storage for the account of the farmer, a so-called "scale ticket" is issued to him by plaintiff. The scale ticket may subsequently be exchanged by the farmer for a warehouse receipt, a storage receipt, or for a check as he elects. Approximately 20 to 30% of the beans delivered at harvest time are purchased by plaintiff. Thereafter the plaintiff may or may not purchase additional quantities of beans depending to a large extent upon whether the beans are acquired by the Government under Government loan provisions. If the beans are purchased by plaintiff, the charge for picking out culls and other waste material is deducted from the price to be paid the farmer and he is then paid the prevailing market price for the estimated amount of cleaned and processed beans, although the beans at this point have not yet been processed. If the beans are received for storage for the account of the farmer, the same procedure is followed, except that the beans are processed and the remaining choice cleaned beans are commingled in plaintiff's elevator with other choice cleaned beans, and such commingled cleaned and processed beans are subsequently either sold or returned to the farmer, when and as he directs. Under either method, the farmer is always paid for his beans on the basis of choice cleaned and processed quality. Thus, the farmer in all events pays a standard price per hundred weight for cleaning, processing and storing of the beans.

8. In brief, plaintiff's employees take the following action to prepare the beans for market: The beans are taken from storage and dumped into an elevator line which conveys them to a "scalping" machine designed to remove large debris, such as sticks, unhulled pods, pieces of clay, stones and the like. From this point the beans go to cleaning machines which consist of moving slotted screens, designed to remove split and broken beans, and of round hole screens, which remove under-sized beans and smaller inert particles of foreign materials. Finally, the beans move to a gravity or wind blast machine which removes the remainder of the foreign materials and stones; and thence to the polishing machines for final cleaning. Or they may go on to sorting machines or picking rooms for further cleaning and processing operations. The beans are then bagged or packaged either for shipment or for return to growers.

9. In addition to Great Northerns and Pintos produced in the Nebraska-Wyoming area, plaintiff also processes Great Northerns, Pintos, Small Reds, Kidney, Large and Small Limas, and Black-eyed beans produced in Idaho, Colorado, Montana and California. It also processes dry edible peas produced in Northern Idaho and Eastern Washington. Plaintiff's operations in processing these beans and peas are substantially identical to those used upon beans locally grown with the following variations only:

(a) In Idaho plaintiff performs a "custom milling" operation in connection with the beans received. Custom milling is a final preparation of the beans performed for commercial seed houses. These beans, which are custom milled, are run by elevator lines through a pneumatic air separator to remove splits and broken beans and thence through electric sorting machines or picking tables and finally into bags for reloading and return.

(b) In the State of Idaho only, in addition to preparing and processing the beans for the edible market, plaintiff also prepares and processes beans and peas for the seed market. The processing of beans and peas for seed is accomplished in an identical manner to the processing of such vegetables for the edible market except that screen sizes leave the larger beans and peas only and stocks are not intermingled but are sacked and identified by producer. In processing seed beans and peas each lot

is processed separately and all are passed through an electric sorting machine.

10. Beans owned by plaintiff are bagged or boxed in varying weights from one hundred pounds down to one pound. These beans are sold to dealers, canners, packagers, wholesalers or large grocery concerns. They may be exported to Mexico, Canada, Cuba, or other foreign countries or sold to the United States Government or its agencies, as, for example, the Military Services.

11. On the chart attached hereto as Exhibit C and made a part hereof is a true and accurate breakdown of the total compensation paid by plaintiff to all of its employees in the three state area in connection with its operations during the calendar years 1951 and 1952. In addition to total compensation, Exhibit C contains a true and accurate statement of the compensation, not in excess of $3,000 per employee, paid to all employees, and the compensation, not in excess of $3,000 per employee, paid to warehouse employees. As used in Exhibit C, the term "warehouse employee" refers only to employees engaged in the actual and physical receipt, weighing, sampling, grading, storing, cleaning, milling, packaging or bagging, preparing for shipment and delivering for shipment, beans and peas cleaned and processed by plaintiff. The term "warehouse employee" does not include executive, clerical, office and similar classes of employees even though such employees are employed in plaintiff's operations.

12. It has been administratively determined in the States of Nebraska and Wyoming and by the Supreme Court of the State of Idaho that warehouse labor employed by plaintiff is exempt within the meaning of the term. "agricultural labor" as defined in the respective state Unemployment Tax Acts, R.R.S.Neb. 1943, § 48–601 et seq.; W.C.S.1945, § 54–101 et seq.; I.C. § 72–1301 et seq. (This fact is stipulated for the purpose of showing that no taxes are paid to the respective states on wages paid to warehouse labor and plaintiff is not entitled to claim any credit against the Federal Unemployment Tax for this reason.)

13. Attached hereto and made a part hereof as fully as if set out herein is Exhibit D which is a Claim for Refund of taxes paid for the calendar year 1951, which claim was properly and timely filed by plaintiff.

14. Attached hereto and made a part hereof as fully as if set out herein is Exhibit E which is a Claim for Refund of taxes for the calendar year 1952, which claim was properly and timely filed by plaintiff.

15. Attached hereto and made a part hereof as fully as if set out herein is Exhibit F which is a disallowance in full of the Claims for Refund for the calendar years 1951 and 1952 referred to in each of the two foregoing paragraphs."