ANDREW J. MURPHY, SR., Chairman; EDWARD C. CROW, and HARRY P. DRISLER, Members of the Unemployment Compensation Commission of Missouri, Appellants; v. MID-WEST MUSHROOM COMPANY, a Corporation.—No. 38157.—168 S. W. (2d) 75.

Division One, December 15, 1942.

Rehearing Denied, January 19, 1943.

*George A. Rozier*, Chief Counsel, and *Mahlon Z. Eubank*, Assistant Counsel, for appellants; *Harry G. Waltner, Jr.*, of counsel.

*Gage, Hillix, Hodges & Cowherd* for respondent.

HYDE, C.—This is an action by members of the Unemployment Compensation Commission, under Section 9436, R. S. 1939, to collect amounts claimed to be due, for the years 1937, 1938, and 1939, as contributions required by Section 9427, R. S. 1939. Defendant claimed exemption under Section 9423, R. S. 1939, for employment of agricultural labor. The court found for defendant and plaintiffs have appealed from the judgment entered against them.

The court found that "defendant and its employees were engaged in planting, cultivating, raising, harvesting and processing mushrooms grown by defendant for market; that said work was performed on two small tracts of ground located in Jackson County, Missouri; that there was no other agricultural activity carried on by defendant on the above-mentioned tracts." These tracts, of 9 acres and 26½ acres, were at the edge of Kansas City and were sites of abandoned rock quarries. There were caves on each and the mushrooms were grown, in these caves, in beds made of manure and soil. Each cave was equipped with pipes or radiators to furnish heat during cold weather to keep the mushrooms from freezing and to start germination. It was necessary to keep the temperature from going below 40 degrees. Each cave also had a ventilation system to keep the air from getting stale because mushrooms need fresh air. Mushrooms grow better if conditions are like those under which they grow naturally outside in the spring. Best results are obtained by having the mushrooms start producing in the springtime when they get the natural warmth from the outside. Mushrooms are grown from spawn, usually referred to as seed, planted in the fall so that they will mature early in the spring. Only one crop was produced each year. Defendant tried to produce a second crop but found it impractical in that climate.

Defendant's evidence was that "mushrooms have to be grown in the country, or in a part that is not settled, on account of the odor from the manure, when you mix it;" that "in order to get soil for your beds, it has to be worked and built up to a certain point before it can be used;" and that "after we use the top soil, in order to build it up to a state where it can be used to go in the mushroom beds again, we have to plow the ground, and often (grow) soybeans or some forage crop on it, and plow it under, for two or three years, before the ground can be used again." Horse manure, used in producing mushrooms, was unloaded in the late spring, after the crop had been harvested. Water was thrown on it for the purpose of causing decomposition. It was turned several times by hand, during the summer, about a month or six weeks being required to compost the manure. In the fall, about two feet of this composted manure was placed in the beds on the floor of the caves and about six inches in the beds in racks along the sides. After the manure was placed in the beds it would heat and the spawn was put into the bed when its temperature dropped down to around from 70 to 80 degrees.

Defendant usually made three plantings in the fall, extending over a period of two or three months. After the spawn was planted, top soil was put on top of the bed to a depth of one to two inches, and the bed then watered. Defendant used no chemicals in growing mushrooms, but it was necessary to water the beds occasionally. Some of the crop might be ready to harvest in December, but the flush production was in the spring of the year. The crop was usually completely harvested by the latter part of May. After harvesting the crop beds were cleaned out, during the summer months; both the compost and the soil being thrown out of the cave. It could not be used again because disease and insects might be in the soil. Mushrooms were harvested by pulling them out of the bed, the root being cut off and thrown away. During the growing season, the beds were gone over regularly and the plants harvested. It was necessary to fill in the holes in the soil caused thereby, and to pick off mushrooms dying in the beds, thus working the soil.

Mushrooms are a very perishable product. They must be handled quickly after they are harvested by being cooked and sealed in cans. Defendant tried to can its mushrooms within an hour after they were picked because every hour after that they would lose much of their quality. If they were not canned within 24 to 36 hours after being picked they would be almost a total loss. The canning was done in the packing shed on one of the farms. The mushrooms were dumped from baskets into wooden vats of water and cleaned, culled and sorted. They were then cooked in boiling water from 3 to 5 minutes and put into cans. The cans were put on a capping machine which placed a top thereon and sealed them, brine being added during this operation. They were then cooked again from

12 to 15 minutes, labeled and taken to the warehouse, a part of the same building. There they were placed in pasteboard cartons and kept until sold. Defendant marketed most of its production, in the eastern part of the United States, which is the big mushroom market in this country.

Defendant's labor needs fluctuated with the seasons. Common unskilled labor, farm labor, was employed. The busy time was in the spring when the crop was harvested; and "when busy packing mushrooms," defendant employed "just anybody that happens to come along, that looks like they are healthy enough to do the work." However, "that is cut down considerably after the crop is harvested, when so many people are not needed to turn the manure." Defendant would "hire a few more . . . to get the hot beds fixed," but the manager said "if the mushroom crop is not ready and producing by the time we get all the hotbeds in, we have to lay off quite a lot of help again." In 1937, the number of employees varied from 32 to 67 (only 5 or 6 working throughout the year); and from 43 to 200 in 1938 and 1939. Women were employed in the canning work. During these years, defendant paid an occupation license as a mushroom merchant to the City of Kansas City.

The question for decision is whether the work shown to have been done by defendant's employees in production of mushrooms comes within the classification of "agricultural labor." In St. Louis Rose Co. v. Unemployment Compensation Commission, 348 Mo. 1153, 159 S. W. (2d) 249, this court construed the term "agricultural labor" as used in Section 9423. We held that as so used it must be defined in its broader sense as "the science and art of production of plants and animals useful to man," which "includes farming, horticulture, forestry, dairying, sugar making, etc." Our General Assembly has now by its 1941 amendment specifically stated that these and other activities are included in the definition of "agricultural labor." (Laws 1941, p. 566.) Plaintiffs contend for the narrower view of the original exemption, such as that taken in Colorado, both as to mushrooms and greenhouses. [Great Western Mushroom Co. v. Industrial Comm. of Colorado, 103 Colo. 39, 82 Pac. (2d) 751; Park Floral Co. v. Industrial Comm., 104 Colo. 350, 91 Pac. (2d) 492.] We considered and refused to follow the Park Floral Company case in the St. Louis Rose case. Plaintiffs also point to certain administrative rulings and interpretations as to what came within this exemption. However, these cannot be considered controlling because they were not long established ones but were in fact frequently changed. Certainly mushroom growing comes within the definition of production of plants useful to man. The fact that these plants are grown in caves, which are artificially heated at times, instead of in open fields, does not change the character of the work done or labor employed. Defendant's labor requirements were seasonal and the

evidence clearly shows that work with the soil (use of fertilizer, etc.) similar to that essential to the production of other plants was a most substantial part of what was done. Defendant canned only its own mushrooms (and was not a processor of any products of others) which was shown to be the only method of marketing its crop. [See American Sumatra Tobacco Co. v. Tone, 127 Conn. 132, 15 Atl. (2d) 80.] Agriculture, like industry, is advancing in methods from the knowledge, research, and findings of modern science and invention. New uses for foods and fibers are constantly being discovered, and new methods are being developed to facilitate and improve their production. Our conclusion is that the Legislature of this great agricultural State knew this and did not mean to adopt a narrow and restrictive view. We therefore hold that it must have used the broad term "agricultural labor" in the sense we construed it in the St. Louis Rose case.

Plaintiffs contend that the 1941 amendment was a change of this exemption to make it broader and more inclusive. Defendant claims it was only a clarification of the statute and not a change at all. This amendment may have broadened the definition of "agricultural labor" to some extent, by including fish hatcheries and wild life, and particularly in its adoption of clause Four with such an all inclusive definition of the term "farm." Nevertheless, we do not think that it is true of raising mushrooms, under the circumstances shown in this case, because this was clearly the production of plants useful to man which had to be done in sparsely settled territory and required much of the kind of work with the soil generally understood to be "agricultural labor." Plaintiffs also claim that the clarification made in 1941 was of legislative policy (see title to Act, Laws 1941, p. 566) to require that "this law shall be liberally construed to accomplish its purpose to promote security against unemployment both by increasing opportunities for placements through the maintenance of a system of public employment offices and in providing for the payment of compensation to individuals in respect to their unemployment through the accumulation of reserves." (Section 9422, as amended Laws 1941, p. 568.) They say this requires a different construction of the term "agricultural labor" than made in the St. Louis Rose Company case. However, this particular amendment specifically referred to security from unemployment through employment offices and accumulation of reserves. It said nothing about exempt classifications and where these were mentioned in this 1941 Act the exemption of "agricultural labor" was specified to be in accordance with the construction made in the St. Louis Rose Company case. These contentions of plaintiffs cannot be sustained. However, we do sustain plaintiffs' contention that it was error to tax costs against them. [Murphy v. Limpp, 347 Mo. 249, 147 S. W. (2d) 420.] This part of the judgment must be reversed.

The judgment in favor of defendant on the merits of the case is affirmed; but that part assessing the costs against the plaintiffs is reversed. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.,* absent.

### ON MOTION FOR REHEARING.

HYDE, J.—Plaintiffs contend that the canning operations of defendant cannot come within the exemption of "Agricultural labor" and say that the opinion "may be cited as authority for the proposition that labor performed in the processing of agricultural products, even though such products are wholly or partially purchased from others, constitutes exempted employment." However, our ruling was based on and confined to the facts shown here, namely: That defendant processed by such canning only the mushrooms grown by it on its two tracts located close to each other; that it did this canning on one of these tracts as it harvested its mushrooms and immediately in connection therewith; that its harvested mushrooms would become worthless in a matter of hours unless this was done; and that there was no other way to market its mushrooms when they were gathered except to can them. In short, the canning was so closely connected with harvesting as to practically be a part of it. We intended no ruling on processing of products produced by others, in connection with processing of one's own products or otherwise, because this record presents no such question. That question is hereby specifically reserved.

The motion for rehearing is overruled.