ROBERTSON, Justice.
B. C. Rogers & Sons, Inc., the Appellee, made application to the Mississippi Employment Security Commission, the Appellant, for refund of contributions in the amount of $121,912.48, paid by it under the Mississippi Employment Security Law. Miss. Code of 1942 Ann. §§ 7368 through 7446. The Commission denied the refund. The Circuit Court of the First Judicial District of Blinds County reversed and entered judgment awarding the refund. From this judgment the Commission has appealed.
The facts in this case are not in dispute. The appellee is a Mississippi corporation, the stock of which is owned entirely by Mr. B. C. Rogers. Mr. Rogers as an individual is involved in an extensive poultry producing operation around the Town of Morton, in Newton County, Mississippi. All the chickens raised by B. C. Rogers, through contract growers, are sold to the corporation, B. C. Rogers & Sons, Inc. The corporation owns a plant and machinery in the Town of Morton valued at $1,000,000. There are about 450 employees in the plant. The sole work of the corporation is the dressing, cleaning, cutting up, packaging, selling, and distributing the chickens to the retail outlets. B. C. Rogers, as an individual farmer, sells all of his chickens to the corporation and the corporation likewise purchases its entire supply of live chickens from B. C. Rogers, the individual farmer. In explaining the complete operation from the egg to the packaged chicken ready for the consumer market, John M. Rogers, President, Secretary and Treasurer of the corporation, and the son of B. C. Rogers, testified:
“A. In a broiler operation, you need hens to produce eggs for the hatcheries. The number of hens would be based on a previous record of several months back. You get your eggs from this source. The eggs are transferred to the hatcheries. The hatched chickens are then placed on farms where the growers take care of the chickens and raise them into broilers. The farmers — ■ in this case, B. C. Rogers — provides feed and the grower provides labor and the use of his house. Now, the chickens are then caught by a catching crew, which takes the chickens and transports them to the processing plant. From that point they are processed — picked, de- *566 feathered, etc. — and all the necessary work is done for the complete bird to he ready to cook. From that point they are transported by trucks to terminal markets — grocery stores, A & P., etc. — for retail and consumer consumption.
Q. Is that procedure used by Mr. Rogers in his operation?
A. Yes.
Q. Is that the system used by all other farmers ? They are either controlled or owned outright — the plants processing poultry ?
A. Yes. It is necessary 'to have the complete cycle to be able to have a profit or return on your investment. Without every segment of this complete cycle he could not stay in operation today. You have to perform every function of this service to be able to get a return on your investment.”
fie further testified that there is no open market for live poultry in Mississippi or anywhere else in the United States. B. C. Rogers, by way of further explanation, testified :
“Q. (Mr. Triplett) Does B. C. Rogers & Sons, Inc., buy any poultry except from Mr. Rogers ?
A. No, sir. I have a few things I could add. The corporation does pay separate taxes; keeps a separate set of books.
Q. (Mr. Hutcherson) Does the corporation pay Mr. Rogers individually for these chickens ?
A. Yes, sir.
Q. (Mr. Hutcherson) Does the corporation operate as a separate business entity from Mr. Rogers’ individual business ? ‘ '
A, (Mr. B. C. Rogers) There is a lot of overlapping.- But'it is á different operation. In paying taxes, it would be. However, that processing plant is an essential to my growing chickens, because it is just absolutely necessary that I have-, that kind of business.”
The sole question involved on this appeal' is whether or not the services performed by the corporation’s employees in its processing plant are exempt as “agricultural! labor” as defined in Section 7440(i) (6) (A) (Supp.1964) of Mississippi Code of 1942 Annotated. If the services performed', for the corporation, B. C. Rogers & Sons, Inc., by these employees are exempt as agricultural labor, then its applications for refund should be allowed; but if it is determined that the services of these employees are not exempt as agricultural labor,, the applications for refund should be denied.
One of the most fundamental and basic-rules observed by all courts in construing- and interpreting the laws of a State is to> determine the legislative intent and purpose-in enacting a law. This Court over the-years has conscientiously and zealously tried to construe statutes, if reasonably-possible, so as to carry out the legislative-intent and purpose in remedying an evil and' in avoiding a danger or hazard. See Thornhill v. Ford, 213 Miss. 49, 56 So.2d 23 (1952); Virden v. State Tax Commission, 180 Miss. 467, 177 So. 784 (1938); Gift v. Love, 164 Miss. 442, 144 So. 562, 86 A.L.R. 63 (1932).
Economic insecurity due to involuntary unemployment is the menace and evil' that the Legislature attempted to overcome- and conquer when it enacted into law the-Mississippi Employment Security Law. This Court passed on this Law and declared it constitutional in the. case of Tatum et al. v. Wheeless et al., Unemployment Compensation Commission, 180 Miss. 800, 178 So. 95 (1938). The Mississippi Legislature, instating the purpose 'of.the act and the public policy of the.State, used as strong and positive words as the; English' language cam provide.
*567 The Legislature left no room for doubt when it said:
"The purpose of the act is to promote employment security by increasing opportunities for placement through the maintenance of a system of public employment offices and to provide through the accumulation of reserves for the payment of compensation to individuals with respect to their unemployment.” § 7368 Miss.Code of 1942 Ann. (Emphasis added.)
"As a guide to the interpretation and .iapplication of this Act, the public policy .of this State is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, ■morals and welfare of the people of this 'State. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its .spread and to lighten its burden which now so often falls with crushing force ■upon the unemployed worker and his family. The achievement of social se.curity requires protection against this greatest hazard of our economic life. This can be provided by encoiiraging employers to provide more stable employment and by the systematic accumulation .of funds during periods •of employment .to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its .considered judgment the public good, and the general welfare of the citizens of .this State require the enactment of this measure, under the police powers of the State, for the compulsory setting aside of . unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.’’ § 7369 Miss.Code of 1942 Ann. (Emphasis added.)
Keeping this clearly expressed purpose and intent in mind, we now move on to a consideration of Section 7440(i) (6) (A), Mississippi Code of 1942 Annotated (Supp.1964), which is in these words:
“(6) The term ‘employment’ shall not include — (A) Agricultural labor. The term ‘agricultural labor1 includes all services performed—
(i) On a farm, in the employ of any employing unit, in connection with cultivating the soil, or in connection zvith raising, or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training, and management of livestock, bees, potiltry, and fur-bearing animals and wildlife.
(ii) In the employ of the owner or tenant or other operator of a farm, in connection with the operation, management, conservation, improvement, or maintenance of such farm and its tools and equipment, or in salvaging timber or clearing land of brush and other debris left by a hurricane, if the major part of such service is performed on a farm.
(iii) In connection with the production or harvesting of naval stores products, or any commodity defined as an agricultural commodity in section 15(g) of the Federal Agricultural Marketing Act, as amended, or in connection with the raising or harvesting of mushrooms, or in connection with the hatching of poultry, or in connection with the ginning of cotton, or in connection with the operation or maintenance of ditches, canals, reservoirs or waterways used exclusively for supplying and storing water for farming purposes.
(iv) In handling, planting, drying, packing, packaging, processing, freezing, grading, storing, or delivering to storage or to market or to a carrier for transportation to maket, any agricultural or horticultural commodity; but only if such service is performed as an incident to ordinary farming operations, or in the case of fruits and vegetables, as an incident to the preparation of such fruits or vegetables for market. The provisions *568 of this paragraph shall not be deemed to be applicable with respect to service performed in connection with commercial canning or commercial freezing or in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption.
“As used in this subsection, the term 'farm’ includes stock, dairy, poultry, fruit, fur-bearing animals, and truck farms, plantations,. ranches, nurseries, ranges, greenhouses or other similar structures used primarily for the raising of agricultural or horticultural commodities, and orchards.” (Emphasis added.)
We note particularly that throughout Section 7440(i) (6) (A) great stress is laid on the services being performed on a farm.
Section 7440(i) (6) (A) recites in part “all services performed—
“(i) On a farm * * * including the raising * * * feeding, caring for * * * poultry.”
“(ii) * * * if the major part of such service is performed on a farm.”
“(iii) * ■* * or in connection with the hatching of poultry, or in connection with the ginning of cotton, or in connection with the operation or maintenance of ditches, canals, reservoirs or waterways used exclusively for supplying and storing water for farming purposes.”
“(iv) * * * but only if such service is performed as an incident to ordinary farming operations.”
“As used in this subsection, the term 'farm’ includes * * * poultry * * * farms * * * or other similar structures used primarily for the raising of agricultural or horticultural commodities, and orchards.” (Emphasis added.)
The line of demarcation had to be set somewhere and the legislature, in its wisdom, set it at the boundary line of the farm. It did provide that agricultural labor would include the incidental services of delivering the agricultural or horticultural commodities “to market or to a carrier for transportation to market.”
In the instant case, no part of the services are performed on a farm or for that matter for a farmer. These 450 employees are employed and their salaries paid by a. corporation engaged in a purely commercial enterprise for profit. They work, in a completely separate building constructed especially and exclusively for the processing" of poultry for market, with machinery designed and built for this purpose only, which building and machinery were valued at’ $1,000,000, and on chickens bought and paid for by the corporation. Presumably,. B. C. Rogers the individual farmer sells-his chickens at a profit to the corporation, B. C. Rogers & Sons, Inc., otherwise he would not be still in business as a farmer. Neither they nor their employer have anything whatsoever to do with the raising of the chickens nor for that matter with the delivering of the chickens to the processing plant where they work.
A case very much in point is that of Lake Region Packing Association v. United States, 146 F.2d 157 (5th Cir. 1944). In that case the United States Fifth Circuit Court of Appeals, in ruling on a question similar to the one involved here, said:
"Appellant, a non profit cooperative marketing corporation, brought this suit to recover sums collected from it as social security taxes * * *. Its claim was that being an agricultural cooperative, which, through its employees performed for its members the labor required to cultivate, pick, haul to market, package, process, and market their fruit, it and its employees were in effect employees of the members, and the work done by them was 'agricultural labor’.” 146 F.2d at 158.
“ * * #
“[W]e are in no doubt that the provisions of the Social Security Act apply in the same way to all corporations alike, *569 ■without distinction between those organized to obtain -profits for their stockholders in the ordinary way and those organised to obtain them through coop■eration. If Congress had intended to deprive, of the security the act was intended to confer, the employees of corporations which took the cooperative way ■of obtaining profits for their members by sharing savings rather than the ordinary method of distributing profits, it ■could, and would, have said so. After all, the stockholders of corporations, whether cooperative or ordinary, intend to, and do, derive advantages from the use by them of the corporate form. It is for Congress, and not for us, to say whether there should be an exemption extended to the one class of corporations ■and denied to the other. We think it clear that appellant stands exactly in the same case as if it were a corporation •organized in the usual way for the distribution of profits to its members * *. If this packaging, processing, and marketing had been done by the individual farmers, or if without the organization ■of a corporation and the creation of a business as a result of that organization, the packaging had been done by the individual farmers through persons cooperatively provided and furnished to them as employees, all of the operations here in question would have been exempt. Our holding, however, that a cooperative corporation is no different from an ordinary corporation and the fact established and found that this corporation had an investment of around $200,000.00, and employed 150 to 200 persons, requires an af-firmance of so much of the judgment as denied exemption in respect of the labor of packing and marketing. For it is quite clear that here is a case not of packing, processing and marketing as incidental to ordinary farming operations, but one, the essence of which zvas a commercial operation. Because this is so, those acts, which zvere not performed in the field or in connection with getting the product from the field to the place of processing and were therefore not per se agricultural, are deprived of their agricultural character by the dominance in the operation of their commercial character.” (Emphasis added.) 146 F.2d at 159-160.
The Supreme Court of Florida in the case of Florida Industrial Commission v. Growers Equipment Company, 152 Fla. 595, 12 So.2d 889 (1943), sheds light on the instant case when it reasoned, tliusly:
“The record in this case shows that Growers Equipment Company was not engaged in growing or producing fruit, but was engaged in the processing and canning of fruit and that it performed the service for two or three other corporations which produced the fruit and did some processing for others.

"It is contended that, because the fruit was produced by corporations which were largely owned and controlled by the same person who in effect ozvned and controlled Growers Equipment Company, Growers Equipment Company was not engaged in commercial canning. With this contention we are unable to agree. Growers Equipment Company and the several corporations which produced the fruit were just as much separate legal entities as they would have been, so far as the matters here under consideration are concerned, as if the stock in each had been owned and each had been controlled by different individuals.

"It was, and is, therefore, our conclusion that Growers Equipment Company zvas engaged in commercial canning and zvas not engaged in the packing of its own fruit produced by it. The size of the operation is immaterial. It is the method of the operation which controls. Undoubtedly, under the provisions of the Act here under consideration, if the grower, whether a corporation or an individual, grows and processes its own *570 fruit, then its processing activity does not come within the purview of the Act because it is then an incident to the horticultural operation of the owner, but when several different individuals or corporations, or different individuals and corporations, produce fruit and deliver that fruit for packing and processing to another individual or corporation which is engaged solely in the enterprise of packing and processing fruit, then the exemption does not apply to the packing and processing operation." (Emphasis added.) 12 So.2d at 895-896.
In its argument the appellee emphasized and stressed that there is no open market for live poultry in Mississippi, or for that matter, anywhere else in the United States. That argument could also be made for live pigs and hogs and for cattle on the hoof. Pigs, hogs and cattle, as with poultry, must be killed, cleaned, drawn and quartered and extensively processed before pork and beef are ready for the consumer market.
Counsel has cited no case and the writer of this opinion has found none holding that the employees of the processors of hogs and cattle are engaged in agricultural labor by virtue of the fact that their services are incidental to ordinary farming operations.
The appellee lays great stress on the judgment of the United States District Court of Nebraska in the case of Chester B. Brown Company v. United States of America, 152 F.Supp. 803 (D.Neb.1957). This was a food processor’s suit to recover federal unemployment taxes, the plaintiff contending that its warehouse employees are engaged in agricultural labor. This case is not analogous to the case at bar because the court in the Brown case goes off on the peculiar provision of the statute, which provides: “or, in the case of fruits or vegetables, as an incident to the preparation of such fruits or vegetables for market.” In that case, in distinguishing between a first processor and a terminal market, the court said:
“Irrespective of whether the taxpayer purchases a quantity of the beans before-the actual processing is undertaken (and. the record shows that approximately 20-30% of the beans delivered at harvest time are purchased), the point is whether,, in the course of such operations, the activities of the taxpayer extend beyond’ those reasonably, associated with the operations of a 'first processor’. In other-words, the test can be stated in terms-of, not who owns the beam, but after-wards what does the proprietor do with-them. And in this connection, it is only-necessary to establish that all of the taxpayer’s operations constitute an essential’ part of the processing function, the sole purpose of which is to ready the commodity for distribution for consumption.. We think they do. As stipulated, the-beans owned by the taxpayer, after being sorted, graded, and cleaned, are bagged or box’ed in varying weights and sold to wholesalers and dealers. Before they can be placed in channels of trade, however, the vegetables require the taxpayer’s processing services. Its business, by ;nature, is not a terminal market. Thus-the fact that the taxpayer purchases a-quantity of beans prior to their processing would not make it one. Once satisfied that the taxpayer is properly within the area demarcated as 'first processing’ and not beyond it, by all logic its-employees must come within the definition of agricultural labor exempting the-employer from the liabilities in question. We so hold." (Emphasis added.) 152 F.Supp. at 805.
The appellee is also impaled on this-horn of a dilemma. Section 7440 (i) (6) (A) (iv), provides that:
"The provisions of this paragraph shall not be deemed to be applicable with respect to service performed in connection with commercial canning or commer *571 -cial freezing or in connection zvith any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption." (Emphasis added.)
These live chickens delivered by B. C. "Rogers, the individual farmer, to the corporation, B. C. Rogers & Sons, Inc., constitute a delivery to a terminal market for ■distribution for consumption. B. C. Rogers, the individual farmer, sells at a profit and ■ delivers the chickens to B. C. Rogers & Sons, Inc., the corporation, and is paid for the chickens upon delivery. At that point :he loses all economic interest in the chick•ens for which he has been paid, and from that point on they are possessed, controlled -and owned by a completely separate entity, which performs all the varied steps of processing and preparing these chickens for the consumer market. The corporation ■sells the finished product to A & P and ■other grocery chains, who in turn sell to ■the consumer.
It is thus abundantly clear that the •employees of the corporation, B. C. Rogers ■& Sons, Inc., working only at the job of processing chickens for the consumer mar"ket in the corporation’s separate plant, are ■not engaged in agricultural labor, and their services are not exempt under the provisions of Section 7440(i) (6) (A) (iv). Their services are not performed as an incident to ordinary farming operations. Their services are performed after the delivery of live chickens to a terminal market to be there processed and prepared, and then distributed to retail outlets for sale to the consuming public.
The Judgment of the Circuit Court is, therefore, reversed and the Order of the Mississippi Employment Security Commission is reinstated.
Reversed and order of the Commission reinstated.
GILLESPIE, P. J., and JONES, BRADY and INZER, JJ., concur.