429 P.2d 427

Elna LOWE, Loretta M. Goodwin, Janet L. Hartman and Doris E. Stagemeyer, Plaintiffs-Respondents,

v.

BERTIE'S POULTRY FARMS, INC., Defendant-Appellant,

and

Department of Employment, Defendant-Respondent.

No. 9743.

Supreme Court of Idaho.

June 23, 1967.

Benoit, Benoit & Alexander, Edward L. Benoit, Twin Falls, for appellant.

Frank H. Powell, Boise, for respondent Department of Employment.

John W. Gunn, Caldwell, for respondents Elna Lowe and others.

SPEAR, Justice.

This proceeding is before the court to determine whether appellant Idaho corporation, Bertie's Poultry Farms, Inc., should pay employment security contributions, or whether it should be entitled to an agriculture exemption as provided for in the Employment Security Law. I.C. § 72–1316, amended 1965 Session Laws, ch. 214; I.C. § 72–1304(a) (4), amended, 1951 Session Laws, ch. 235.

Appellant's assignments of error propose solely the question of whether the Industrial Accident Board's interpretation of the term "incident to ordinary farming operations," as used in the agricultural labor exemption provision of the Employment Security Law, I.C. § 72–1304(a) (4), is legally correct as applied to the facts of this case, i. e., the operations of appellant corporation considered herein.[1] Those facts, briefly stated, are as follows:

Appellant, Bertie's Poultry Farms, Inc., together with a second Idaho corporation, Apple Valley Farms, Inc., is a family-owned business, which has, since 1937, been engaged in the hatching, raising, slaughtering, processing and packaging of chickens, and to a lessor degree, other types of domestic fowl, for market. The operation is large in that approximately one and one-half million birds have been processed and sold in a given year. The main sales area extends from Roberts, Idaho, to Ontario,

[1] I.C. § 72–1304(a) (4), providing exemption for agricultural labor, specifically allows an exemption from the operation of the Employment Security Law in the event the nature of the services performed are such as are involved,
"In handling, planting, drying, packing, packaging, processing, freezing, grading, storing, or delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultural commodity; but only if such service is performed as an incident to ordinary farming operations or, in the case of fruits and vegetables, as an incident to the preparation of such fruits or vegetables for market. The provisions of this paragraph shall not be deemed to be applicable with respect to service performed in connection with commercial canning, freezing, or dehydrating in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption."

Oregon, and interstate shipment comprises between 25 and 35 per cent of the total sales. While grocery stores form the major outlet for the product of the operation, sales are additionally made to distributors and institutions, including the federal government.

The overall operation of the business is again conducted by two separate and distinct, though family-owned, corporations; however, our concern here is specifically with that phase of the business conducted by the appellant, Bertie's Poultry Farms, Inc.

The first step in the operation begins at the Apple Valley Farms poultry breeder farm at Hagerman, Idaho. Here, approximately 70 per cent of the eggs for hatching are produced. Eggs for hatching are also obtained under a contract arrangement, whereby breeding stock is furnished to area farmers, who produce eggs for hatching from this stock. The farmers are paid for their time and reimbursed for the feed. The parent stock remains on the farm until it is out of production, whereupon it is reclaimed and transported to be eventually processed as fowl.

The second phase of the operation is also conducted by the Apple Valley Farms corporation. The eggs are hatched at a Twin Falls, Idaho, hatchery owned and operated by that corporation. The hatchery is situated on property leased to it by the appellant corporation, and is located near the processing plant owned by the appellant.[2] Apple Valley Farms employs a total of about eight persons, either for work in connection with its poultry breeder farm at Hagerman, or its hatchery in Twin Falls.

After hatching, the chickens are placed with various local farmers who raise the chickens to commercial size; and the chickens are then returned to Apple Valley Farms, which has retained ownership of the chickens throughout the growing period. The farmer, under this arrangement, is furnished all of the necessary components to raise the chickens, and in turn, furnishes the labor and housing. Apple Valley Farms then sells the chickens to Bertie's Poultry Farms for processing and marketing, the final phase of the operation. Though both corporations are jointly owned and managed, separate books are kept for each corporation; consequently, when chickens are furnished by Apple Valley Farms for processing by the appellant corporation, a book transfer is made that reflects the transaction price of the sale.

It further appears from the record that Apple Valley Farms sells some of the chickens from its hatchery directly to the appellant corporation. There is again a book transfer which reflects the transaction price accompanying the sale. The latter corporation then follows the same procedure in consigning the chickens to local farmers for raising to commercial size.

The final phase of the operation occurs at the processing plant at Twin Falls, owned and operated by the appellant corporation. There the live chickens are slaughtered and the processing begins. Processing consists of four basic operations: picking the chickens, eviscerating them, cutting them into parts, and putting them into packages. The plant has three lines for accomplishing this purpose, at each of which are employed varying numbers of persons. There are between 65 and 75 persons employed in the processing plant, and appellant corporation operates and pays the payroll of the processing shed.

Appellant corporation also purchases processed poultry and some frozen chickens, which it repackages and markets. However such purchases consist basically of parts of chickens that are used to fill orders for parts where gaps occur in the corporation's

2. The findings made by the Industrial Accident Board are, with regard to the ownership and control of the hatchery, admittedly somewhat ambiguous; however, it is clear both from the record and the brief of appellant corporation, that it is the Apple Valley Farms corporation, and not the appellant corporation, which owns and operates the hatchery, and pays the payroll therefor.

inventory and are mainly purchased as a convenience for its customers. They are, therefore, merely incidental to appellant's basic method of operation. These purchases do account for approximately 10 per cent of the birds marketed by the appellant; the remaining 90 per cent are obtained through the process of egg production, hatching and contract raising hereinbefore described.

The appellant is also engaged in the processing of over 100,000 turkeys annually. This part of the business was described as required because of the slack season which occurs each year during the months of November and December, and was undertaken, appellant states, in order to offer additional employment to its employees.

Appellant, as part of its total operation, also delivers some of its product in trucks operated by the corporation.

Overall, appellant employs between 70 and 80 persons, including sales people and office personnel and delivery people as well as those employed in the processing plant.

Claimants-respondents herein were employed by appellant, and worked in the processing plant on the chicken processing lines. The specific question with which we are concerned is whether the earnings of respondents were in covered employment.

The Industrial Accident Board, having before it for consideration solely the operation of the appellant corporation, determined its "manner of operation is not an 'ordinary farming operation' but rather is a business enterprise involving contracts between two corporations and various contract arrangements with numerous independent farmers, as well as purchases outright from other bird producers, all of the transactions occurring before the processing, packaging and sale of the birds can begin," and concluded the labor employed was not exempt as agricultural labor under I.C. §§ 72–1316 and 72–1304(a) (4). With that conclusion we must concur. Consequently, the decision of the Board requiring appellant corporation to pay employment security contributions on the earnings of respondents as set forth in its Order, dated July 22, 1965, must be affirmed.

In Florida Industrial Commission v. Growers Equipment Co., 152 Fla. 595, 12 So.2d 889 (1943), respondent-employer, Growers Equipment Company, operated a canning plant which processed for market fruit from groves owned by West Coast Fruit Company and Kilgore Groves, Inc. The majority of the stock of the three corporations was owned, operated and controlled by a single person. Respondent corporation additionally processed for market a small quantity of fruit owned by others. During the period considered, 58,732 boxes of citrus fruit were processed from groves owned and operated by the West Coast or Kilgore Groves Corporations, and 1,147 boxes of fruit were processed from other sources.

Respondent sought exemption from liability under an agriculture exemption provision identical to our I.C. § 72–1304(a) (4) with respect to the wages paid its employees in the canning plant. However, the Florida supreme court denied the claim for exemption, concluding that those employed in the canning plant worked in covered employment. In denying a petition for rehearing the court stated:

"The record in this case shows that Growers Equipment Company was not engaged in growing or producing fruit, but was engaged in the processing and canning of fruit and that it performed the service for two or three other corporations which produced the fruit and did some processing for others.

"It is contended that, because the fruit was produced by corporations which were largely owned and controlled by the same person who in effect owned and controlled Growers Equipment Company, Growers Equipment Company was not engaged in commercial canning. With this contention we are unable to agree. Growers Equipment Company and the several corporations which produced the fruit were just as much separate legal entities as they would have been, so far as the matters here under consideration are concerned, as if the stock in each had

been owned and each had been controlled by different individuals.

"It was, and is, therefore, our conclusion that Growers Equipment Company was engaged in commercial canning and was not engaged in the packing of its own fruit produced by it. The size of the operation is immaterial. It is the method of the operation which controls. Undoubtedly, under the provisions of the Act here under consideration, if the grower, whether a corporation or an individual, grows and processes its own fruit, then its processing activity does not come within the purview of the Act because it is then an incident to the horticultural operation of the owner, but when several different individuals or corporations, or different individuals and corporations, produce fruit and deliver that fruit for packing and processing to another individual or corporation which is engaged solely in the enterprise of packing and processing fruit, then the exemption does not apply to the packing and processing operation." 12 So.2d at 895–896.

In Stivers v. Department of Employment, 42 Cal.2d 486, 267 P.2d 792 (Cal.1954), the facts adduced show that four brothers— Morgan A., Glenn, Howard and Archie Stivers—were members of a partnership, which owned, among other properties, 357 acres of citrus groves. One brother, Morgan A. Stivers, was the managing and operating partner of all the properties of this "four-way partnership." Raymond K. Stivers, a fifth brother, owned separately an additional 70 acres of citrus groves.

Raymond and the "four-way partnership" formed a packing-house partnership known as the Stivers Packing Company under his, Raymond's, management. All the fruit from the Stivers' groves, i. e., the combined 427 acres, was packed in this packing-house, and constituted 80 per cent of the entire amount of products handled; the remaining 20 per cent of the total fruit packed came from the groves of others. The alleged primary and sole purpose of the packing-house partnership was to produce, harvest, pick, sell and ship citrus fruits from the Stivers' groves.

The Stivers Packing Company sought exemption from the operation of the state's Unemployment Insurance Act with regard to the service of its employees in the packing-house on the ground such employees were engaged in agricultural labor. However, the California supreme court, giving special consideration to the whole manner of operation of the packing-house partnership, ruled that the co-partners' packing-house employees were not engaged in agricultural labor exempt from the Act, but engaged in commercial activities, and, therefore, covered under the Act.

The court, in determining that the operation of the packing-house partnership was by its nature commercial, *and not incident to ordinary farming operations,* stated:

"Plaintiffs seek to avoid the commercial aspect of their packing-house upon the premise that its principal purpose was to facilitate the marketing of the crops from the Stivers' groves. However, the test under the act is not the principal purpose of the enterprise but whether the services performed by its employees were 'carried on as an incident to ordinary farming operations as distinguished from * * * commercial operations.' Thus significant is the fact that the packing-house served the public to the extent of 20% of its total fruit packing operations, a sizable amount attesting to its commercial character. [267 P.2d, at 795.]

\* \* \* \* \* \*

"Undoubtedly, services performed in a packing-house operated by and for the farmer-grower of agricultural products may constitute 'agricultural labor' under the act provided 'such services are carried on as an incident to ordinary farming operations as distinguished from * * * commercial operations.' But here the producers of the fruit formed a packing-house partnership which functioned not alone in their behalf in the marketing process. Rather, the packing-

house also served the public to the substantial extent of 20% of its total fruit packing services. As so operating for profit on a commercial scale, the packing-house became a single integrated enterprise operating much the same as any business concern, and it should not be treated any differently insofar as bearing its proportionate share of the social responsibilities flowing from the state employment insurance law." 267 P.2d at 796.

The supreme court of Mississippi in Mississippi Employ. Sec. Com'n v. B. C. Rogers & Sons, Inc., 193 So.2d 564 (Miss.1964) was presented the question whether the agricultural exemption provision of that state's Employment Security Law, again identical to our I.C. § 72–1304(a) (4), applied to the activities and services performed by the corporation employer engaged in the processing of live chickens for market under an organizational arrangement almost exactly the same as that which is presented in the case at bar.

The employer was a Mississippi corporation, the stock of which was owned entirely by one B. C. Rogers. Mr. Rogers as an individual was involved in an extensive poultry producing operation. All the chickens raised by B. C. Rogers, through contract growers, were sold to the corporation, B. C. Rogers & Sons, Inc.; and the corporation likewise purchased its entire supply of live chickens from B. C. Rogers, the individual farmer. The corporation employed about 450 employees at its processing plant, and the sole work of the corporation was dressing, cutting up, packaging, selling, and distributing the chickens to retail outlets.

The court, relying heavily upon the rationale expressed in Florida Industrial Commission v. Growers Equipment Co., supra, concluded the services performed by the corporation's employees in its processing plant were not exempt as "agricultural labor," but were covered employment under the Employment Security Law, stating:

"These live chickens delivered by B. C. Rogers, the individual farmer, to the corporation, B. C. Rogers & Sons, Inc., constitute a delivery to a terminal market for distribution for consumption. B. C. Rogers, the individual farmer sells at a profit and delivers the chickens to B. C. Rogers & Sons, Inc., the corporation, and is paid for the chickens upon delivery. At that point he loses all economic interest in the chickens for which he has been paid, and from that point on they are possessed, controlled and owned by a completely separate entity, which performs all the varied steps of processing and preparing these chickens for the consumer market. The corporation sells the finished product to A & P and other grocery chains, who in turn sell to the consumer.

"It is thus abundantly clear that the employees of the corporation, B. C. Rogers & Sons, Inc., working only at the job of processing chickens for the consumer market in the corporation's separate plant, are not engaged in agricultural labor, * * *." 193 So.2d at 571.

The reasoning enunciated in the above cited cases is particularly appropriate to the instant case, and consistent with the prior recognition by Chief Justice Givens, writing in Batt v. Unemployment Comp. Div., 63 Idaho 572, 123 P.2d 1004, 139 A.L.R. 1157, that "[a]ny number of activities if carried on in the home or on the farm are agricultural in their nature, whereas if carried on under different conditions, either as to place or extent of the work performed, fall into a different classification," and that "[c]ourts as courts should not shut their eyes to what they know of the common affairs of business and industry."

The facts as shown by the record support the conclusion that appellant corporation, Bertie's Poultry Farms, conducted a single integrated operation, both in law and in fact, separate and distinct from Apple Valley Farms corporation, having a definite commercial aspect, such that its activities could not be considered "incident to ordinary farming operations" with relation to those activities performed by the Apple Valley Farms corporation within the intent

and meaning of I.C. § 72–1304(a) (4) and the declared public policy of this state as expressly set forth in I.C. § 72–1302, amended 1949 Session Laws, ch. 144, to afford some measure of economic security in the event of involuntary unemployment.

The circumstance that there existed no other processing plant in the area to which the chickens could be transported for processing for market, and appellant's accompanying claim that for this reason its operations must necessarily be interpreted as incident to the preparation of a completed farm product in salable form, are not persuasive; rather, the controlling factor, clearly present in the case at bar, is the very obvious commercial aspect which the appellant's operations had acquired.

See generally, Anno. 53 A.L.R.2d 406, for an extensive review of cases wherein courts have discussed the question of what constitutes "agricultural" or "farm" labor within unemployment compensation acts.

Order of the Industrial Accident Board, affirmed. Costs to respondents.

TAYLOR, C. J., and SMITH, Mc-QUADE, and McFADDEN, JJ., concur.