AGRI–FOODS, INC., Appellant,

v.

INDUSTRIAL COMMISSION OF MIS-SOURI and Division of Employment Security, Respondents.

No. KCD 26636.

Missouri Court of Appeals, Kansas City District.

July 1, 1974.

Robert Grant Walsh, Ballwin, for appellant; Thomas, Busse, Cullen, Clooney & Ottsen, Harry O. Moline, Jr., Robert S. Cohen, St. Louis, of counsel.

Lloyd G. Hanley, Rick V. Morris, Lloyd G. Poole, Jefferson City, for respondents.

Before DIXON, C. J., and SHANGLER and WASSERSTROM, JJ.

SHANGLER, Judge.

Appellant, Agri-Foods, Inc. seeks review of an order of the Circuit Court of Cole County affirming a decision by the Industrial Commission that certain employees of appellant at its Ste. Genevieve and Chesterfield operations during the year 1971 were not exempt as "agricultural labor" from the provisions of the Missouri Employment Security Law, RSMo 1969, Chap. 288, V.A.M.S. A deputy of the Missouri Employment Security Division determined that these employees were not "agricultural labor" and ordered appellant to comply with the provisions of the chapter. An appeal by Agri-Foods resulted in a hearing before a referee of the division's appeals tribunal. After affirmance of the deputy's determination by the referee, the Commission denied appellant's application for further administrative review and Agri-Foods sought judicial review of the Commission's order.[1]

Agri-Foods is a Missouri corporation engaged in the business of egg production. During the fiscal year in dispute, appellant had total sales of about $2,500,000 and supplied almost 15% of the total egg market in the St. Louis metropolitan area. Within the structure of a single corporation, appellant conducts an integrated operation which includes a feed mill at Ste. Genevieve, a hatchery at Troy, and an egg processing plant at Chesterfield. Its operations begin with the hatching of fertile breeder eggs at the Troy plant. The female chicks are then placed on a pullet farm, also at Troy, owned by Agri-Foods. When mature the hens are taken to contract egg farms where they are housed and fed for egg laying. Agri-Foods supplies the contract growers with feed from its mill, and medicine and technical and supervisory assistance. The contract growers are compensated according to the number of eggs produced. The eggs laid at the contract farms are regularly picked up by appellant and delivered to its Chesterfield processing plant. There the eggs are washed, tested, candled and graded to meet governmental standards and are then packaged and delivered to restaurants, hotels, institutions and other outlets in the St. Louis area. At all times in this production process the eggs and hens that produce them are owned by Agri-Foods.

The pullets at the Troy hatchery and the hens on the contract egg farms are fed from the mill at Ste. Genevieve. The product of the mill is also used for appellant's pig feeder operation conducted on a contract farm in Ste. Genevieve. The surplus feed, about 35% of the total production, is sold to farmers. There was evidence that because of the economic factors about 90% of the eggs marketed in Missouri are produced by operation similar to those conducted by appellant, and that such operations have become quite typical of egg production throughout the nation.

There is no dispute that the employees of appellant exchange their services for wages within the meaning of the Employment Security Law [Chapter 288, RSMo 1969, V.A.M.S.]. The sole question on this appeal is whether the employees at the Ste. Genevieve mill and at the Chesterfield egg processing plant are in "employment", and

---

1.  § 288.200(1) provides that, "[I]f an application for review is denied, the decision of the appeals tribunal shall be deemed to be the decision of the commission for the purposes of judicial review."

thus covered by the Law [§ 288.034(6)], or are "agricultural labor", and thus exempt.[2] The agricultural labor exemption is defined by § 288.034(6)(a) [in relevant part] as services performed:

  a. *On a farm*, in the employ of any person, . . . *in connection with raising or harvesting any agricultural or horticultural commodity*, including the raising, shearing, feeding, caring for, training and management of livestock, bees, *poultry*, fish and fur-bearing animals and wildlife.

  c. . . . in connection with the hatching of poultry . . .

  d. *In handling, planting, drying, packing, packaging, processing, freezing, grading, storing, or delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultural commodity; but only if such service is performed as an incident to ordinary farming operations* or, in the case of fruits and vegetables, as an incident to the preparation of such fruits or vegetables for market. The provisions of this paragraph shall not be deemed to be applicable with respect to service performed in connection with commercial canning or commercial freezing or in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption.

  e. As used in the preceding four subparagraphs, the term "farm" includes stock, dairy, *poultry*, fish, fruit, fur-bearing animal, and truck *farms*, plantations, ranches, nurseries, hatcheries, orchards, ranges, greenhouses, mushroom sheds and caves or other similar structures *used primarily for the raising of agricultural or horticultural commodities.* (Emphasis added).[3]

It was the conclusion of the appeals referee that

  Although the word "farm" is not specifically defined in the Missouri Employment Security Law . . . the Law contemplates that a farm shall include only the operations used for the raising of agricultural or horticultural commodities . . . [T]hat the processing of feed purchased from others and the processing of eggs for sale on the market at a location different than where the eggs are produced are not included in the term agricultural labor.

Agri-Foods does not contend that any of the employees in question perform services "on a farm" under subparagraph a of § 288.034(6)(a), and respondent acknowledges that the services described in subparagraphs c and d need not be performed "on a farm" to qualify as exempt agricultural labor. Rather, it is the contention of appellant that (1) the feed mill employees are exempt under subparagraph c because performing services "in connection with the hatching of poultry" and (2) the processing plant employees are exempt under subparagraph d because their activities are "incidental to ordinary farming operations". The quiddity of the response the Division of Employment Security makes is that the mill and egg processing operations are too remote geographically and commercially to the function of a hatchery; that

---

**2.** The employees at the Troy hatchery had been determined, previously, to be exempt [presumably under § 288.034(6)(a) e] and their status is not in issue.

**3.** This appeal concerns Agri-Foods' liability for contributions to the Employment Security Fund during the year 1971 only. Accordingly, we limit our analysis and decision to the terms of the Law as it was then in effect. Effective April 27, 1972, these sections were modified. Hatcheries are omitted altogether from the term "farm" in the 1972 enactment. Likewise the "incident to ordinary farming operations" test of subparagraph d has been replaced by a test requiring that those engaged in handling, processing, grading, etc. be *"in the employ of the operator of a farm"* and the operator must have produced *"more than one-half of the commodity with respect to which such service is performed;"* (Emphasis added.) Laws 1972, p. 900. § 288.034(12)(1)(b)(d)(i).

these adjunctive operations, although convenient, are not essential for a hatchery.

A claim for exemption from the operation of the Employment Security Law must be considered within the context of the declared public policy that the Law is an enactment for the general welfare and shall be liberally construed to accomplish its purpose to promote employment security by providing for the payment of compensation to individuals in respect of their unemployment. § 288.020, RSMo 1969, V.A. M.S.; O'Dell v. Division of Employment Security, 376 S.W.2d 137, 141[2–5] (Mo. 1964). To that remedial end, the provisions of § 288.034(6)(a) for exemption of agricultural labor from taxation are most strongly construed against those claiming, who must clearly establish the right to exemption. In re First National Safe Deposit Co., 351 Mo. 423, 173 S.W.2d 403, 405[2–4] (banc 1943).

Turning to the questions at hand, the determination of whether an employee is not subject to the unemployment compensation tax because the services are performed in connection with the hatching of poultry [or other activity specifically exempt] under § 288.034(6)(a)(c) or are exempt as incidental to ordinary farming operations under § 288.034(6)(a)(d), the basic inquiry relates to the nature and purpose of the employer's operation. Fors Farms, Inc. v. Washington State Emp. Sec. Dept., 75 Wash.2d 383, 450 P.2d 973, 976[1–3] (1969). It is clear that the corporate purpose of Agri-Foods is to produce eggs, not to hatch chicks, a purpose attested by evidence that the value of egg production for the year 1971 was $1,729,296, or about 70% of appellant's total sales to consumers. The product of a hatchery is chicks, but chicks do not lay eggs; mature pullets do. Therefore, the contention that the services performed at the mill were in connection with the hatching of poultry does not support the claim for exemption under subparagraph c. It was shown, rather, that the hatchery was conducted as

an incident of the primary corporate purpose of production of eggs. There is, in any event, another conclusive reason why appellant may not claim exemption for the services of the Ste. Genevieve mill; the mill operation was impressed with a commercial character. It is obvious that the mill—which served the public to the extent of 35% of its total product and which accounted for $722,516, or about 30% of the total corporate sales for 1971—did not function on behalf of appellant's marketing process alone. It must be concluded that the operation of the mill was for profit on a commercial scale and must be made to bear its share of the burden of the general welfare [as any other business] under the Employment Security Law. See: Stivers v. Department of Employment, 42 Cal.2d 486, 267 P.2d 792 (banc 1954).

We consider next the contention that the processing plant employees at Chesterfield were exempt under subparagraph d because their activities were incidental to the ordinary farming operation of hatching of poultry. What we have already concluded about the absence of any such incidental relationship between the mill operation and hatchery applies with equal cogency to the egg-processing plant. It is self-evident, nevertheless, that egg production is an agricultural activity. And the proof was conclusive that the processing of eggs as to grade and cleanliness according to governmental standards was necessary to market the product lawfully. It cannot be questioned, therefore, that if Agri-Foods had raised the eggs on its own farms, the processing plant would be an exempt activity within the prescription of subparagraph d relating to services performed

> In handling . . . processing . . . grading . . . any agricultural . . . commodity but only if such service is performed as an incident to ordinary farming operations . . .

The question remains whether the method used by Agri-Foods to produce eggs through contract farmers compromises its

status as an egg farmer. Otherwise stated, does Agri-Foods process eggs as an incident to its own farming operation?

■ In this determination we are without benefit of any Missouri decisions, so we look to the constructions accorded by foreign jurisdictions to their employment security acts. Although not conclusive, these constructions are persuasive because the employment security enactments of the several states form an integral part of the national plan for social security and represent a cooperative effort by the states and the national government to carry out a common purpose for the general welfare. Mid-Continent Aerial Sprayers v. Industrial Commission, 420 S.W.2d 354, 358 (Mo. App.1967) ; Pioneer Potato Co. v. Division of Employment Security, 17 N.J. 543, 111 A.2d 888, 889[1] (1955).

■ In Wirtz v. Tyson's Poultry, Inc., 355 F.2d 255, 259 (8th Cir. 1966), the question considered by the court was whether a corporation, a producer-processor-marketer of eggs which did not own or lease a farm, but which provided pullets to contract farmers for egg laying, was engaged in farming. As with Agri-Foods, so with Tyson, title to the layers and eggs was retained by the corporation, feed and medication were supplied by the corporation which also supervised a pick-up program; in each case, the contract grower merely furnished the house, labor and utilities for the birds, and the grower was paid at a fixed scale completely unaffected by the market, thus drastically reducing the grower's risk. On these facts, the court held that the workers at the Tyson egg processing plant were "employed in agriculture" and thus exempt from the operation of the statute. Although the Tyson decision construed the Fair Labor Standards Act, and not an unemployment compensation law, the definition of "agriculture" ascribed by the federal statute [29 U.S.C.A. § 203]:

the raising of . . . poultry, and any practices . . . performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market

and by the regulations promulgated in pursuance of the statute [Title 29 CFR, Labor, § 780.166] :

[A]ctivities that may be performed in the "preparation for market" of the indicated commodities and . . . come within the exemption [include]

(d) Eggs. Handling, cooling, grading, candling, and packing.

is substantially the definition of "agricultural labor" in our law. We conclude, as did the court in Tyson, that egg production is an activity ordinarily done on the farm and that the device of production whereby the farmer [Agri-Foods] contracts with other farmers for egg production, furnishes the laying pullets, retains title to the birds and eggs and bears the financial risk of production does not alter the contractor-producer [Agri-Food's] status as farmer.

We have concluded that the production of eggs by Agri-Foods was an ordinary farming operation and, since there was no market for the product unless graded and certified, the processing of the eggs by Agri-Foods was an activity "incidental to [its] ordinary farming operations" within the meaning of subparagraph d of § 288.034(6)(a), and thus exempt from taxation under the law. We cite no Missouri precedent for this view, because this provision has not been construed previously by our courts, but abundant authority from sister states supports our conclusion.

The question presented in Etchechoury v. Avi-Simplot, Inc., 93 Idaho 438, 462 P. 2d 737 (1969) was whether, under a statute of virtually identical import and wording, an employee of the corporate employer's poultry processing plant performed services "incidental to ordinary farming operations". The corporate employer owned both the poultry farms and processing plant and, with minute exception, processed only the poultry grown by its employees or contract farmers. It was the contention of the employee that, although the poultry producing enterprise of the corporation was an "ordinary farming operation", the processing plant, physically separated from

the poultry farm, was not incidental to that operation. The court framed its response with two questions: (1) Why should the processing activity of the corporate producer, which if done at the farm would be agricultural labor, lose its agricultural character if done at a plant some distance from the farm? (2) Despite the physical separation of the plant from the farm, does not such labor remain incidental to the farming operation? The court concluded that the whole character of the employment, not only the pending task or place of performance, determines whether an employee is engaged in agricultural labor. The test applied by the court for exemption as agricultural labor under the statute [our subparagraph d] was [l.c. 741] "whether the processor is in reality a farmer-producer, and whether the processing is incidental to such farming". Under the uncontradicted evidence that there was virtually no market for live poultry, the processing was necessary to create a market for the poultry on its farms, that the breeder, hatchery, mill, farms and processing plants of the corporation were a unitary and integrated operation—with no profit or loss taken at any of these segments—the court determined that the poultry processing plant performed services incidental to the ordinary farming operations of the corporation, and thus the processing plant employees were exempt as agricultural labor. See, also: Cache Valley Turkey Growers Ass'n. v. Industrial Commission, 106 Utah 1, 144 P.2d 537, 538 [1, 2] (1943); American Sumatra Tobacco Corporation v. Tone, 127 Conn. 132, 15 A.2d 80, 82[2] (1940); Employment Sec. Comm'n of Arizona v. Bruce Church, Inc., 109 Ariz. 183, 507 P.2d 108, 111[4] (banc 1973).

In according the exemption under statutes in the substantial form of our subparagraph d, the authorities maintain a clear distinction between processing activities of farmer-producers incidental to their farming operations—and thus agricultural in nature and exempt—and processing activities of non-farmers or of farmer-producers who function in substantial part in behalf of the marketing process of others—and thus commercial in nature and nonexempt. Thus, the agricultural exemption of subparagraph d does not apply to a corporate farmer which processes poultry owned and grown by a separate business entity [Mississippi Employment Security Commission v. B. C. Rogers and Sons, Inc., 193 So.2d 564 (Miss.1962); Lowe v. Bertie's Poultry Farms, Inc., 91 Idaho 695, 429 P.2d 427 (1967)]; nor does it apply to a processor which, although a farmer-producer, does substantial business with the public and has thereby acquired a commercial character [Stivers v. Department of Employment, supra; Florida Industrial Commission v. Growers Equipment Co., 152 Fla. 595, 12 So.2d 889 (1943); nor as to a farmer-producer who processes for market a product [eggs] purchased in substantial portion from other and independent growers. In Re Perkins, 14 A.D.2d 185, 217 N.Y.S.2d 705 (1961). Our Supreme Court in Murphy v. Mid-West Mushroom Co., 350 Mo. 658, 168 S.W.2d 75 (1942), by analogy of principle, construed an earlier version of the Employment Security Law [even in the absence of a provision such as subparagraph d] to allow exemption for agricultural labor for a grower of mushrooms who processed and canned his own produce.

◼ The respondent Division of Employment Security contends, nevertheless, that since the eggs go to retail outlets from the processing plant, the plant at Chesterfield constituted a "terminal market for distribution for consumption" so as to preclude the processing services from exemption as agricultural labor under subparagraph d. The statute does not define a terminal market neither has any Missouri case considered its meaning. Cases from other jurisdictions, however, clearly indicate that a terminal market is the point at which the producer-grower parts with his economic interest and control over the future form and destiny of the commodity, so that when the product has reached a terminal market, any services then performed with respect to the commodity cannot be exempt as agricultural labor. Producer's Crop Improvement Ass'n v. Dallman, 178

F.2d 66, 70 (7th Cir. 1949); Burger v. Social Security Board, 66 F.Supp. 619, 626 [5, 6] (D.C.S.D.Cal.1946); Claim of Lazarus, 268 App.Div. 547, 52 N.Y.S.2d 682, 687 [3–5] (1944). In the circumstances of this case, Agri-Foods did not part with its economic interest in the eggs until after the processing had made them ready for market. Our decision does not mean to affect those employees of Agri-Food who distribute the eggs for sale, but only those at the Chesterfield plant whose processing labor prepare the egg product for market.

The judgment is reversed with directions that the cause be remanded to the Industrial Commission of Missouri for entry of finding and order that the employees of Agri-Foods at the Chesterfield plant at the period in question were engaged in agricultural labor and therefore exempt from the provisions of the Employment Security Law.

All concur.