(No. 6040. December 14, 1933.)

LOUISE DORRELL, Respondent, v. NORIDA LAND & TIMBER COMPANY, Employer, and STATE INSURANCE FUND, Surety, Appellants.

[27 Pac. (2d) 960.]

P. C. O'Malley and Wm. J. Costello, for Appellants.

Sidney H. Smith, for Respondent.

HOLDEN, J.—In the spring of 1931, the Norida Land & Timber Company (hereinafter called the Company) purchased a complete sawmill plant, frame factory and

planing-mill located at Dover, Idaho, about twelve miles from Laclede, Idaho. Dover was the headquarters of the Company, where it had about a hundred houses, as well as a boarding-house for employees, and operated a store. At the time of the purchase of the mill property the Company also purchased, for speculative purposes, certain lands located near Dover and Laclede.

Some of the land at or near Laclede had been used as a town site and lumber-yard, and upon which land a lumber company had a lumber-mill. The mill had burned down and the property abandoned for mill purposes, and as a result part of the land was strewn with old slabs, iron and debris and in addition to that, there were a lot of concrete foundations, with an abundant crop of growing weeds. In 1931, the Company, for the purpose of improving and selling the land, cleaned and plowed up some of the land and put it into oats and grass seed. In 1932, the Company either planted, or caused to be planted, to timothy, about eighty acres of its land near Dover, as well as about eighty acres near Laclede, to oats.

The Company employed William Dorrell in August, 1931. It appears that one David E. Hurley, in September, 1932, was "more or less" in charge of the outdoor affairs of the Schaeffer-Hitchcock Company; that September 13, 1932, Mr. Hurley requested two Schaeffer-Hitchcock Company teams to be sent down to the tract of land so planted to oats, and that William Dorrell was sent down with the teams; that the work of gathering and hauling the oats to a common assembling point for threshing, began September 13, 1932, under the direction of Mr. Hurley, with four of the teams and wagons of the Schaeffer-Hitchcock Company; that Company being paid for the work by the Norida Land & Timber Company. Between 10:30 and 11 o'clock of the morning of September 13, 1932, Dorrell got down to the oat land near Laclede and began helping in the work of hauling and assembling the oats. He loaded and drove one load to the assembling point, and as he was driving the second load out of the field, in crossing a depression, "he lost his

balance and fell off and struck the ·nigh horse and slid down under the wheels and the wheel of the wagon passed over him, killing him instantly."

The Company had not, prior to the date of the accident for which the widow claimed compensation, "elected in writing filed with the board, that the provisions of the Act (Workmen's Compensation Law) shall apply," as provided by section 43–904, I. C. A., under which the protection of the statute of those employed in agricultural pursuits is otherwise denied.

Upon the hearing of the widow's claim for compensation before and by the Industrial Accident Board, the claim was allowed and compensation awarded, from which award an appeal was taken to the District Court for Bonner County. March 17, 1933, a decree was entered in said District Court affirming the award of the Industrial Accident Board. From that decree the Norida Land & Timber Company, employer, and the State Insurance Fund, surety, appealed to this court.

While numerous errors are assigned, appellants state, and we think correctly, that the alleged errors may be grouped into two fundamental questions:

1. Did the injuries of the deceased, William Dorrell, arise out of and in the course of his employment?

2. Does the evidence support the findings of fact, conclusions of law and judgment?

Those questions, which we deem to be decisive, will be discussed in that order. The record contains a report of the Company dated September 14, 1932. That report states the employer Company is insured by the State Insurance Fund; that William Dorrell was an employee of the Company, and had been, since August, 1931. The record also contains another paper, which paper is signed by the Company and designated both as "Pay Roll Report" and "Policy No. 16108." Under a heading, in a column of the Pay Roll Report and Policy, reading: "Description of work," we find the following: "Contractors—Watchman, etc."

Concerning the work performed by the deceased, and the nature of his duties, John E. Schaeffer, president of the Company, testified:

"Q. Do you know of your own knowledge what Mr. Dorrell's work mainly consisted of?

"A. Mainly the upkeep of the property.

"Q. Yes.

"A. Such as hauling fence posts to various fences and nailing up windows where they were broken, cutting weeds along the highways, in fact, keeping the property up the best we could. That was our only object and the only kind of work we had, in fact.

"Q. Now, Mr. Schaeffer, state if you know at the time you took out insurance with the State Insurance Fund, what did you state or what was stated in the insurance issued by the State Insurance Fund that your employees—what business were your employees to be engaged in?

"A. Watchmen and upkeep.

"Q. Lumbering?

"A. No. Watchmen at the plant, night, watchmen, and day wages and for the upkeep of the plant, repair work.

"Q. You stated on direct examination in reply to a question of Mr. Davis that you had paid premiums in all that you had employed including Mr. Dorrell.

"A. Yes.

"Q. Now, what did you class Mr. Dorrell as? What was he doing?

"A. He was repairing and working around the upkeep of the plant.

"Q. He was working in the upkeep of the plant?

"A. Whatever there was to do around there.

"Q. I want to ask a question. Did Mr. Dorrell perform all of his duties at the farm at Laclede?

"A. No, he was just down there a part of the time. I guess it was the first time that he ever worked down there.

"Q. The day that he got hurt was the first time that he worked there?

"A. I think it was the first day that he was there, if I am not mistaken. I don't think that he ever worked there before. We have our foreman here that knows exactly, but his work was entirely at Dover until we sent him down there with two teams. Our foreman is here.

"Q. What did he do at Dover?

"A. He repaired fences and drove teams whenever they had any work to do, any sidewalks to fix, and last winter, I think, when the heavy snow caved the roof of the boarding house in he helped fix it, just general repair work. I don't know whether he did any watching around there or not.

Mr. David E. Hurley, outside foreman of the Schaeffer-Hitchcock Company, testified:

"Q. You knew Mr. Dorrell, did you, during his lifetime?

"A. No.

"Q. When did you first see him?

"A. On September 13, 1932.

"Q. That was the day that he was killed?

"A. Yes.

"Q. And where was he?

"A. At Laclede, Idaho.

"Q. What time did he go there?

"A. Between ten thirty and eleven o'clock, A. M.

"Q. And what were you all doing there that day?

"A. We were going to remove the oats off one field to a place to assemble for threshing.

"Q. How many loads of that did Mr. Dorrell haul out?

"A. He had loaded one load and removed it to the place of assembly and was coming with the other one when the accident occurred."

.    .    .    .    .    .    .    .    .    .    .

"A. Well, I was requested—all I know that I could say about it, I requested two teams to be sent down there and he was sent down, and that is all I know.

"Q. Whose teams were those?

"A. Schaeffer and Hitchcock's.

"Q. How many wagons did you have?

"A. I had four there that day to start in with.

And Olivia Sund, an employee of the Schaeffer-Hitchcock Company, testified:

"Q. You work for the Schaeffer-Hitchcock Company?

"A. Yes.

"Q. In their offices?

"A. Yes.

"Q. Do you have charge of the books and accounts for the Norida Land & Timber Company as well?

"A. I do.

"Q. Do you know who paid for this hauling of oats at Laclede?

"A. Yes. The Schaeffer-Hitchcock Company paid for it, but it was charged to the Norida Land & Timber Account.

"Q. The Schaeffer-Hitchcock Company paid the money for it and charged the Norida Land & Timber Company account?

"A. Yes. ·

"Q. Oh, and how long have you been in the employ of the Norida Land & Timber Company?

"A. Well, I am not exactly employed by them. I am employed by the Schaeffer-Hitchcock Company, but we take care of the Norida account in the Schaeffer-Hitchcock Company office.

"Q. I will ask you to look at those two instruments, one marked 'Defendants' No. II' (the Pay Roll Report and Policy No. 16108, hereinbefore mentioned) and the other marked 'Defendants' Exhibit No. III' and ask you to state if that is your signature.

"A. It is.

"Q. Well, Miss Sund, those documents are signed Norida Land & Timber Company by you, are they not?

"A. Yes.

"Q. Now, you state that you included all the help or employment of every kind. How did you include it? Under what terms?

"A. We included it under watchmen, I think, originally.

"Q. Under contractors and watchmen, wasn't that right?

"A. Yes, contractors and watchmen."

From the above-quoted testimony it very clearly and satisfactorily appears that: The deceased was employed to perform the duties of a watchman, and to do general repair work, "nailing up windows where they were broken," hauling fence posts; cutting weeds along the highway, and whatever there was to do around the *plant*.

And that the Company employed the deceased to perform the duties of a watchman over its plant and property located at Dover appears from the Pay Roll Report of the Company and Policy No. 16108, which, indicating the employees covered by the report and policy, reads: "Contractors—Watchman, Etc." But one *watchman* is covered, because the policy reads in the singular, and not in the plural, and that *watchman* must have been the deceased, because he is the only person mentioned in the evidence as a *watchman*, and the only person actually named who appears to have performed any duties as a watchman.

It is also clear from the evidence that the *regular* and *principal*, if not practically sole, employment of the deceased was that of *watchman* and *general utility man* at and about the *plant* and property of the Company located at Dover, and not at Laclede, and that there was never any deviation from that *regular* and *principal employment*, but in a single instance. The original employment of the deceased did not contemplate or embrace the performance of any duties or labor for the Company at Laclede; so that the performance of labor by the deceased in gathering and hauling oats was not within the scope of his *regular* and *principal* duties as a watchman and general utility man.

The work of the deceased in assisting in hauling oats was merely incidental to his regular and principal employment; incidental in the sense that such labor was chance and casual.

At the time of the accident the deceased was still an employee of the Company, and was not, therefore, an employee of the Schaeffer-Hitchcock Company, whose outside foreman and men were engaged, and whose equipment was being used, in gathering and hauling oats. Consequently, there

being no change, as between the Company and the deceased, in the general nature and character of or contract of employment of the deceased, the Company was legally bound to pay him, or his estate, for the work of hauling the oats, exactly the same wages paid for services rendered as a watchman and general utility man, as if and as though there had been no temporary interruption in the performance of his regular duties and labor. The Company could not, on the one hand, have paid the deceased less than he was entitled to receive for services and labor performed within the scope of his regular and principal employment, and on the other hand, the deceased could not have compelled the Company to pay him more, in the event the wages for a farm laborer had been, or were, greater than the wages the Company was paying him; and further, the deceased could not have had a valid farm labor claim against the Schaeffer-Hitchcock Company, because he at no time passed from the employment of the Company into the employment of the Schaeffer-Hitchcock Company, and for the further reason that the deceased could not serve two masters at one and the same time.

We turn now to a consideration of the material and applicable provisions of sec. 43–904, I. C. A. Subdivision One of that section reads as follows:

"1. Agricultural pursuits. Agricultural pursuits, as used herein, shall include the caretaking and handling of livestock on enclosed lands and public ranges."

If, within the meaning of the statute, the deceased was employed in "agricultural pursuits," or an agricultural pursuit, at the time he received the injuries which caused his death, then no compensation can be allowed. In determining whether the deceased was, or was not, employed in an agricultural pursuit, at the time of the accident, that subdivision, as well as the Workmen's Compensation Law, and all proceedings under it, must be liberally construed with a view to effect the object of the law and to promote justice. (*Flynn v. Carson*, 42 Ida. 141, 152, 243

Pac. 818; *McNeil v. Panhandle Lumber Co.*, 34 Ida. 773, 203 Pac. 1068.)

What, then, was the legislative intent in using the phrase "agricultural pursuits"? And, in turn, what is the definition of the words "agriculture," "agricultural," and "pursuit."

The term "agriculture" is defined in 2 C. J. 988, as follows:

"The act or science of cultivating the ground, especially in fields or large quantities, including the preparation of the soil, the planting of seeds, the raising and harvesting of crops, and the rearing, feeding, and management of livestock; tillage, husbandry and farming."

"Agricultural," is defined by Funk and Wagnalls Standard Dictionary (1921 Ed.), as:

"Of, pertaining to, or engaged in agriculture."

"Pursuit" is defined by Funk & Wagnalls Standard Dictionary (1921 Ed.), as:

"That which is followed as a continued employment with a view to some end; a definite course of action; business or occupation; as, professional *pursuits.*"

Webster's International Dictionary:

"That which one pursues, or engages in, as a course of business or occupation; continued employment; as, mercantile *pursuits;* a literary *pursuit.*"

The Century Dictionary:

"The object of one's endeavors or continued exertions of application; that which one systematically engages in or follows as a recreation, occupation, profession, or trade, or with some similar end in view; course of occupation or employment; as, literary *pursuits;* mercantile *pursuits.*"

The Oxford Dictionary:

"The action of following or engaging in something, as a profession, business, recreation, etc.; that which one engages in or follows."

"Pursuit," then, means: That which one engages in as an *occupation,* trade or profession; that which is followed as

a continued, or at least, extended and prolonged, employment.

And "occupation" is defined by the Funk & Wagnalls Standard Dictionary (1921 Ed.), as:

"That which principally takes up one's time, thought and energies; especially, one's regular business or employment; also whatever one follows as the means of making a livelihood."

■ The evidence is clear and undisputed that, with the exception of, perhaps, a couple of hours on the day of the accident, the deceased devoted all of his time to and earned his livelihood by (when employed by the Company) performing the duties of a watchman and the work and labor of a general utility man.

Such evidence, it appears to us, amply supports the findings and judgment of the trial court that at the time of the accident Dorrell was not engaged in an agricultural pursuit.

Cases illustrating some of the principles discussed and applied to the case at bar are: *Matis v. Schaeffer et al.*, 270 Pa. 141, 113 Atl. 64; *Dose v. Moehle Lithographic Co. et al.*, 221 N. Y. 401, 117 N. E. 616; *Larsen v. Paine Drug Co.*, 218 N. Y. 252, 112 N. E. 725.

Judgment affirmed, with costs to respondent.

Budge, C. J., and Givens and Wernette, JJ., concur.

Morgan, J., dissents.