## Robinson v. Lytle.

Oct. 7, 1938.

Rehearing Denied Dec. 16, 1938.

398

WHITE & CLARK and W. H. SOUTHALL for appellant.

H. W. LINTON and S. Y. TRIMBLE, IV, for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE STITES—
Reversing.

The appellant, W. B. Robinson, has appealed from a judgment of the Christian Circuit Court, based on the verdict of a jury in favor of appellee, Carl Lytle, in the sum of $2,634.75. Appellant owned a quantity of farm machinery and, on the 11th of March, 1936, he was operating four separate outfits for the steaming of tobacco plant beds. Appellee entered Robinson's employment on the 3d of March of that year and was engaged in the operation of one of these plant bed steaming outfits.

On the morning of March 11, 1936, Lytle was preparing to move this outfit to the farm of John White, a short distance from Hopkinsville on the Canton Road, for the purpose of steaming Mr. White's tobacco bed. Robinson and Carlos Burchett came up and, according to Lytle, Robinson said (referring to Burchett): "Let him drive to White's." Burchett then got upon the engine. Robinson went with them part of the way, then instructed Lytle where to go when he finished at White's, and directed him to be careful in going through gates to see that the machinery was not injured.

The steaming outfit consisted of a steam traction engine behind which was a tank wagon coupled to it by a pole. Behind the tank wagon and coupled to it by a tongue was a low-slung truck on which rested the steaming pan. The whole contrivance was used for the purpose of injecting steam into a tobacco plant bed, and thus to accomplish the same purpose as the burning of wood or brush on the bed.

On either side of the entry to the property of Mr. White there was a gatepost of stone masonry about two feet square and about six feet high. The two posts are ten feet apart. As Burchett and Lytle approached the White farm with the steaming machinery, it was necessary for them to make a left turn to drive between these two pillars. Some years ago, as a threshing machine was being drawn through this gate, it struck the eastern, or left-hand pillar and broke it off near the ground. In falling, it did not break up and it was afterwards

raised and replaced upon the stump from which it had fallen, and "slabs" were driven between it and the stump in order to keep it in an erect position.

As they came up to the gateway, Lytle dismounted and ran ahead, opened the gate, and by motions directed Burchett and cautioned him to avoid striking the gate, which opened to the right, and to avoid the limbs of some trees which overhung the driveway. As soon as the engine had passed through the gateway and under the limbs, Lytle crossed in front of the slow-moving machine to the left-hand side and commenced watching the gatepost on that side. The engine and water tank passed through in safety and the steaming pan had approached to within twelve or eighteen inches of the stone pillar when Lytle wheeled, threw up his hand, and shouted "Whoa!" as a signal to Burchett to stop. Burchett says he at once closed the throttle and stopped. However, the steaming pan did not stop in time to avoid striking the already broken pillar and it fell over and struck Lytle on the back, knocking him to the ground, breaking his pelvis, and otherwise seriously injuring him. There is no suggestion in the record that the verdict is excessive.

In response to a plea of contributory negligence, appellee replied that at the time he was injured he was in the employment of the appellant; that his injuries were received in the course of his employment and arose out of it; that Robinson then had three or more employees regularly engaged in the same line of work, but that he was not operating under the provisions of the Workmen's Compensation Act (Kentucky Statutes, sec. 4880 et seq.).

If the Act applies then, of course, appellant is precluded from pleading contributory negligence or assumed risk as a defense.

Section 4880 of the Kentucky Statutes (section 1 of the Workmen's Compensation Act) provides:

"This act shall apply to all employers having three or more employees regularly engaged in the same occupation, or business, and to their employees, except that it shall not apply to domestic employment, agriculture, [etc.] * * * provided, however, it shall apply to the operators of threshing machines used in threshing or hulling grain or seeds. * * *."

It is argued for appellant that the operation of the plant steaming machine was plainly "agriculture" within the meaning of the Act. There is no difference, in principle, between the method of operation of one of these plant steaming contrivances and a threshing machine and the very fact that the legislature deemed it necessary expressly to exclude threshing machines from the exception of "agriculture" shows that that body considered that otherwise they would be included within the term. If threshing machines alone are taken out, it follows that plant steaming machines remain within the term "agriculture" and the trial court should have so determined.

Likewise, it must certainly be conceded that the burning of a tobacco bed by the old process of piling wood on it and setting it afire would be "agriculture." Can it be said that the use of a machine to accomplish the identical result changes the character of the work? Compare State v. District Court of Watonwan County, 140 Minn. 398, 168 N. W. 130, L. R. A. 1918F, 198. It is not the means employed but the character of work that constitutes the exception. The decisions of the courts of other states, under different statutes, are not of much assistance. Most of the statutes exempt "farm labor" rather than "agriculture." The term "agriculture" used in the Kentucky Act supplies a boundary which is broader, in many instances, than that employed by other states and certainly equal to the most liberal. The Nebraska statute excludes "employers of farm laborers," the Idaho statute excepts those employed in "agricultural pursuits," the Utah statute, "agricultural laborers," the Pennsylvania statute, those "engaged * * * in agriculture," while the common form is to exclude "farm laborers." Since "agricultural pursuit" has been held to "include every process and step taken and necessary to the completion of a finished farm product" (Cook v. Massey, 38 Idaho 264, 220 P. 1088, 1091, 35 A. L. R. 200), and " 'agriculture' covers all things ordinarily done by the farmer and his servants incidental to the carrying on of his branch of industry" (Warner v. Longstreth, 108 Pa. Super. 124, 164 A. 806), and " 'Agricultural laborers' [is] a term broader and more comprehensive than 'farm laborers';" (Davis v. Industrial Commission of Utah, 59 Utah 607, 206 P. 267, 269), it can be readily seen that the boundary extends further in

some cases than in others, and that "agriculture" is the broadest exclusion. In Keefover v. Vasey, 112 Neb. 424, 199 N. W. 799, 35 A. L. R. 191, the court said [page 801]:

> "There is some discussion * * * upon a supposed distinction between one engaged in agricultural pursuits and one engaged in farm labor. Such a distinction doubtless exists in the sense that one who is engaged in the pursuit of agriculture may not necessarily be a farm laborer, but it is quite evident that every farm laborer is engaged in an agricultural pursuit * * *."

In determining what is an "agricultural pursuit" within the exception of the Workmen's Compensation Acts, it has been held that a liberal construction should be given to the statutes. Dorrell v. Norida Land & Timber Company, 53 Idaho 793, 27 P. (2d) 960. And where "threshing machines" are specifically included in the Act and contradistinguished from the exception, the inclusion should be strictly construed and no encroachments tolerated.

It is urged, on the other hand, that we must look to the philosophy of the Compensation Act in arriving at its proper construction. It was the intention of that Act to place the burden for injuries received upon the industries in which they were suffered rather than upon a society as a whole.

> "* * * the farm industry is perhaps less able than others to add the cost of compensation insurance to the market price of its product and pass it on to the consumer * * *." Schneider, "Workmen's Compensation Law" (2d Ed.) Vol. 1, p. 257.

It is insisted that the employer here (the appellant) is not a farmer but is engaged in the commercial business of steaming plant beds for hire.

The argument, after all, however, is rather one of policy to be addressed to the General Assembly than to a court. We must take the Act as we find it and seek to arrive at the actual intention of the legislature rather than to arrive at our own conclusion as to what the law ought to be. There is nothing in the Act from which we might infer that the commercial nature of the transaction would differentiate it from ordinary farming.

The Act does not exempt simply "agricultural employment" or "agricultural laborers" but "*agriculture.*" It is difficult to escape the conclusion, therefore, that it is the nature of the work rather than the nature of the employment or employer that furnishes the key to a proper construction of the Act in this particular.

In Barres v. Watterson Hotel Company, 196 Ky. 100, 244 S. W. 308, upon which appellee leans very heavily, we held that a maid employed at the hotel was not within the exemption of "domestic employment" in the Compensation Act. Clearly, the exemption of domestic employment relates to the character of the employment, whether around the home or elsewhere, and not to the nature of the work done. We said (196 Ky. page 102, 244 S. W. page 309):

"The work of a maid at a hotel like the Watterson, while somewhat similar to the duties of a maid in a home, is an *employment* required in carrying on a commercial enterprise, an industry, and is therefore industrial in its essence and nature, and must be regarded as coming within the provisions of the Workmen's Compensation Act." (Italics ours.)

It was the nature of the *employment* whether commercial or domestic and not the nature of the work done that furnished the basis for that opinion. It is plainly different from the case before us.

But in the final analysis it is unnecessary to place our decision upon the operation of the Compensation Act alone; and, except to avoid a conclusion that in failing to discuss the question we had impliedly determined that the Act applied, we would not have considered it. We are unable to discover from the record before us any actionable negligence upon the part of appellant or his servant, Burchett.

If we assume that Burchett, in disregard of the safety of the machinery, ran the steaming pan at two miles per hour into the gatepost, it is still apparent that the overturning of a stone pillar weighing some fifteen hundred or two thousand pounds was not a probable result of his act or a consequence reasonably to be foreseen. In fact, the testimony indicates that the machinery was moving at less than two miles an hour and that the steaming pan was only about twelve to eighteen inches from the pillar when appellee shouted his warn-

ing. If this was an action against the owner of the gatepost for his negligence in thus leaving the heavy pillar standing without fastening of any kind, we might properly say that he should have foreseen the danger of its being knocked over by someone passing through the gate. Louisville Home Telephone Company v. Gasper, 123 Ky. 128, 93 S. W. 1057, 29 Ky. Law Rep. 578, 9 L. R. A., N. S., 548. But the driver of the steaming machinery had no way of knowing that the pillar was loose and he testified positively that he did not know of its condition. He also testified, as a matter of fact, that the machine was barely moving because he was afraid of hitting the post, but his caution in this particular was for the protection of the machine and not for the unforeseeable hazard of the loose pillar.

A case very similar in principle to the case at bar, and containing an exhaustive collection of authorities, is Nunan v. Bennett, 184 Ky. 591, 212 S. W. 570. Nunan owned a three-story building in the city of Winchester. There was a basement underneath the building. Bennett used the ground floor for a millinery store; the second and third stories were fitted up as living apartments, and were occupied by other tenants. Separate pipes from the basement furnished each story with water. The cut-off in the main pipe was located in that portion of the building rented by Bennett. The lease provided that other tenants of the building should have access to the basement for the purpose of cutting off water to their apartments when it was necessary for any purpose so to do. On the evening of February 3, 1917, because of the cold weather, appellant had his servant turn off the water. The tenant on the second floor returned to his apartment about 10 P. M. Finding the water off, he left some of the faucets open. The following morning, under instruction from appellant, the servant turned on the water, and through the open pipes on the second floor the water overflowed the basin, leaked through the floor and ceiling, and damaged the property of appellee, for which she recovered a judgment in the sum of $2,250. The court reversed this judgment, and held that the lower court should have sustained appellant's motion for a peremptory instruction. In the concluding part of the opinion the court says [page 573] :

"Applying this definition together with the qualifications referred to, we find that the act of defend-

ant in both turning off and turning on the water upon the occasion complained of could not, and as a matter of fact did not, produce the injury complained of, except for the independent, wrongful, and negligent act of the tenant Agee in leaving the faucets in his apartment above plaintiff in such condition as to permit the overflow of plaintiff's premises and the consequent damage to her goods.''

Clearly, the active agency which there produced the injury was the turning on of the water but it was the open faucets that brought about the resulting damage, just as in the case before us it was the unforeseen condition of the gatepost and not any breach of duty of appellant's servant that caused the unfortunate result.

Photographs of the gatepost in the record indicate that, to the casual observer, the pillar was not only cemented at the bottom but that it was firmly attached to a stone wall for more than half of its height. To say that the driver of the machinery should have anticipated that striking this pillar, under the circumstances, would cause it to topple over seems to us to be utterly unreasonable and so contrary to ordinary human experience as to authorize the removal of the question from the consideration of a jury. It follows that there was no negligence proven which would authorize the submission of the issues to a jury and that the trial court erred in failing to sustain appellant's motion for a peremptory instruction in his favor.

All other questions are reserved.

Judgment reversed.

Whole Court sitting.