462 P.2d 737

Lois ETCHECHOURY, Claimant-Appellant,.

v.

AVI–SIMPLOT, INC., and Department of Employment, Defendants-Respondents.

No. 10373.

Supreme Court of Idaho.

Dec. 22, 1969.

John W. Gunn, Caldwell, for claimant-appellant.

Sallaz & Scanlan, and R. LaVar Marsh, Dept. of Employment, Boise, for defendants-respondents.

SPEAR, Justice.

This is an appeal from an order of the Industrial Accident Board denying the claim of appellant Etchechoury for unemployment insurance benefits on the grounds that appellant's work at the AVI-Simplot, Inc.'s poultry processing plant constituted services "incidental to ordinary farming operations," and that such agricultural employment is exempt from the Idaho Employment Security Law under I.C. § 72–1316(a) (1) and I.C. § 72–1304(a) (4).

The respondent employer, AVI-Simplot, Inc., is a corporation engaged in the poultry business, the corporate stock being owned equally by two separate and independent corporations, Arkansas Valley Industries of Little Rock, Arkansas, and J. R. Simplot Company of Boise, Idaho. The total operation of the respondent consists of a breeder farm, feed mill, hatchery, several farms, and a processing plant, each of which constitutes an integral part of the overall fowl producing and processing business. As a part of the operation, the feed mill is operated as a noncommercial venture supplying only the respondent's own requirements.

Although prior to 1968 all of the eggs were purchased from an outside source, two-thirds of the egg requirements are now produced on the breeder farm, with the remainder being purchased as before. From the breeder farm, the eggs are transported to the hatchery where the baby chicks are hatched. The chicks are then sent to the poultry farms owned by the respondent or to one of four contract growers to mature. Approximately ten per cent of the chickens are raised by contract growers who furnish the facilities and labor required, and as compensation therefor, receive a percentage of the net profit derived from the poultry raised on their farms. They have no ownership in the poultry and title remains in the respondent at all times. When the chickens are ready for market, they are taken to the processing plant for processing and later distribution to local stores and out of state distributors.

The respondent purchases no live chickens for processing in its plant with the exception of a negligible amount of stewers which are purchased as a convenience to local farmers who raise chickens for the

production of eggs. In 1967 the stewers amounted to 1.4 per cent of the total production, while in previous years it was less.

Based on records from past years, the respondent employs from 99 to 154 persons in the processing plant and from 67 to 80 persons on the farms, feed mill, and office. Of the total investment of the business, however, only 19¼ per cent is invested in the processing plant, while 56½ per cent is in the farms, 6¾ per cent in the hatchery, and 17½ per cent in the feed mill. Each individual entity of the respondent constitutes a cost accumulating center, and the product or inventory is transferred from the various locations, no profit or loss being taken at these individual points.

Respondent's operation is large as evidenced by the fact that in 1967 the farms owned exclusively by the respondent produced 3,511,000 chickens and 400,000 turkeys. At the same time the contract growers produced 500,000 chickens, and stewers from local farmers amounted to 42,000. The records show that of that total of four and one-half million birds, between one and two thousand head of live chickens per week were sold to an outside processor, with the remainder being processed at the respondent's plant.

It also appears from the record that during the first six months of 1967, approximately 10 truck loads of fryers were purchased from the parent company, AV Industries, and were repackaged and sold to respondent's customers. The total purchase, however, amounted to less than one per cent of the total production for the year, and the Board found that this was an exception to the usual practice of the respondent and was done only to meet existing contracts at a time when production of chickens on respondent's farms was at a low point.

Prior to December 19, 1967 appellant was employed by respondent on the eviscerating line in the processing plant, helping in the trimming, cropping, drawing and packaging of chickens and turkeys. Although she performed various tasks, all of her work during her two and one-half years of employment with the respondent was confined to the processing plant. Upon her dismissal by the respondent, appellant filed a claim for unemployment insurance benefits with the respondent Department of Employment. From the denial of her claim, appellant filed a request for a redetermination, and an evidentiary hearing was conducted before an appeals examiner who affirmed the department's decision, ruling that appellant's work at respondent's poultry processing plant constituted services "incidental to ordinary farming operations" under I.C. § 72–1304(a)(4), and that such agricultural employment is exempt from the Idaho Employment Security Law. On appeal to the Industrial Accident Board, the case was submitted on the record established in the prior hearing and written briefs were submitted by the parties. The Board affirmed the appeals examiner's determination, including his findings of fact. From that decision, appellant perfected this appeal.

The pertinent statute involved in this appeal, I.C. § 72–1304(a), specifically defines agricultural labor which is exempted from the coverage of the Idaho Employment Security Law by I.C. § 72–1316(a)(1). The statute involved provides that "agricultural labor" includes all services performed:

"* * *

"(4) In handling, planting, drying, packing, packaging, processing, freezing, grading, storing, or delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultural commodity; *but only if such service is performed as an incident to ordinary farming operations * * *.*"  (emphasis added)

Appellant does not deny that the respondent's poultry producing enterprise constitutes "ordinary farming operations." She contends, however, that the respondent's processing plant is a commercial undertaking which is not incidental to its farming operations, and, therefore, she was not en-

gaged in agricultural labor and was erroneously denied unemployment insurance benefits.

The sole issue to be decided on this appeal, therefore, is whether the Industrial Accident Board erred in its finding that the respondent's processing plant operates as an incident to its farming operation.

There are no cases directly in point upon which we may rely in resolving this issue. However, in the case of Cache Valley Turkey Growers Ass'n v. Industrial Commission, 106 Utah 1, 144 P.2d 537 (1943), the Supreme Court of the State of Utah was confronted with the task of interpreting a statute virtually identical to I.C. § 72–1304(a) (4). In that case a number of turkey farmers joined in a non-profit mutual corporation for the purpose of processing and preparing for market the turkeys of the association members. The Utah court applied the phrase "but only if such service is performed as an incident to ordinary farming operations" to the processing operations of the cooperative, and ruled that since the processing activity was controlled by the same individuals that raised the turkeys, it must be considered as incidental to their farming operation in the same light as if the individual farmer had done his own processing. The court in its argument stated:

"Here is a case where, as in American Sumatra Tobacco Corporation v. Tone, 127 Conn. 132, 15 A.2d 80, there is no market for the product of the soil until it has been processed. The processing can, and in the past has been done by the individual farmer, but the cost of buying and maintaining equipment to do the work, where there are many birds to handle in a short time, is too great for the individual to bear. When it is done on the individual farms, by the men who raise the turkeys and their hired help, it is admittedly an agricultural occupation, and exempt from the provisions of the act. How then is the situation changed by a number of farmers banding together and forming a nonprofit organization to do that work? The same individuals

pay for the work, and control it, the only difference being that they appoint a corporate agent to supervise it for them." 144 P.2d p. 540.

The case before us is a clearer one in that the respondent occupies a much stronger position under the statute than the cooperative processing poultry produced by its members. In this case the respondent owns both the farms and the processing plant, and processes, with the minute exception of local "stewers," only poultry which is grown by its employees or the contract growers. The questions asked by the Utah court, therefore, are even more appropriate here, i. e., (1) since the processing done by the respondent, if done at the farm, would admittedly be agricultural labor, why should such be non-agricultural labor if done at a plant some distance from the farm? and (2) despite the physical separation of the plant from the farm, does not such labor remain incident to the farming operation?

We are of the opinion that such processing as done by the respondent herein was incidental to its ordinary farming operations. As this court has held in earlier cases, it is the whole character of the employment, rather than merely the pending task or the place of performance, which must be examined to determine whether an employee is engaged in agricultural labor. Mundell v. Swedlund, 59 Idaho 29, 80 P.2d 13 (1938); Dorrell v. Norida Land & Timber Co., 53 Idaho 793, 27 P.2d 960 (1933).

Appellant, in her argument to the contrary, relies heavily on a case decided by this court in 1967. Although the facts in Lowe v. Bertie's Poultry Farms, Inc., 91 Idaho 695, 429 P.2d 427 (1967), are very similar to the factual setting presently before us, the features of the operations in that case which the court deemed to be controlling are absent from the present case. In *Bertie's*, two separate and distinct corporations were involved in the poultry producing and processing business. The appellant, Bertie's Poultry Farms, Inc.,

owned no farms whatsoever and purchased all of the poultry it processed in its plant from another corporation, Apple Valley Farms. Thus, the appellant was engaged in no farming operations to which the processing could be considered incidental within the meaning of I.C. § 72–1304(a)(4), and this court correctly held that labor performed in the Bertie's Poultry Farms, Inc. processing plant was not agricultural labor.

The present case, as contrasted with the *Bertie's* case, differs significantly. In this case the respondent corporation owns the farms upon which the poultry is produced and also the plant wherein the poultry is processed. Ownership of the birds remains in the respondent from the time they are hatched to the time they are finally distributed as a marketable commodity. Whereas in *Bertie's* the profit or loss was computed on the transactions of the processing plant alone, in this case each individual segment of the respondent's operation from the breeder farm to the processing plant constitutes a cost accumulating center, and the product or inventory is transferred from the various locations, no profit or loss being taken at these individual points. Another marked distinction between the two cases, and one which was particularly noted by the appeals examiner in his decision, is that while in *Bertie's* the processing plant constituted 100 per cent of the total investment of the corporation, only 19¼ per cent of the total investment of the respondent herein is in the processing plant, while 56½ per cent is in the farms.

The evidence in the record is uncontradicted that there is virtually no market for live poultry, and that without the processing plant respondent would be unable to market and sell the poultry produced on its farms. It is also undisputed that of the four and one quarter million birds processed by respondent in 1967, over 87 per cent were produced on the respondent's farms, and over 98 per cent of the birds processed were owned by the respondent from the time they were hatched to the time they were processed and distributed.

Thus, it is evident that the primary purpose of the respondent's poultry business is to produce, hatch, raise, and sell poultry, that the various components of the corporation constitute a single integrated farming venture producing and processing poultry, and that the operation of the processing plant is incidental to the respondent's total farming enterprise.

Appellant argues, however, that to apply an exemption in this case after denying it in the *Bertie's* case would produce the ridiculous result wherein, of two persons doing identical work in two different processing plants, one would be classified as performing agricultural labor and would receive no unemployment insurance benefits upon being relieved of her job, while the other would be engaged in non-agricultural labor and would receive benefits.

■ While seemingly valid on its face, appellant's argument in reality has no merit. Appellant does not deny that if a farmer were to raise a small number of chickens and employ a person to "trim, crop, draw, and package" such chickens in a building on the farm that such employment would constitute "agricultural labor" under the statute here involved, and that such employee would not be entitled to unemployment insurance benefits when he was relieved from his job. Therefore, to hold that the employee on the small farm is engaged in agricultural labor, while appellant doing the same job for a larger corporate farmer is not engaged in agricultural labor would appear not only equally anomalous as the example proffered by the appellant, but erroneous as well. The test as to what constitutes agricultural labor turns not on the size of the farming operation involved, but rather on whether the processor is in reality a farmer-producer, and whether the processing is incidental to such farming.

In Florida Industrial Commission v. Growers Equipment Co., 152 Fla. 595, 12 So.2d 889 (1943), and in Mississippi Employ. Sec. Com'n v. B. C. Rogers & Sons, Inc., 193 So.2d 564 (Miss.1967), cases relied upon by the court in *Bertie's*, the cor-

porations there involved did *not* produce the agricultural product they processed. For that reason the court in each case held that the processing was not incidental to ordinary farming operations. Both cases, therefore, espouse the rule of law herein expressed that if one processes his own farm product, i. e., a product raised by him or his employees, such processing is incidental to the ordinary farming operations conducted by him.

As has been recognized in previous cases dealing with the language here involved, it is virtually impossible to give a general definition of the phrase "incident to ordinary farming operations" which would cover all of the diverse factual situations which may arise. Consequently, each case must be decided more or less upon the peculiar and definitive features involved therein, and oftentimes the lines separating those engaged in agricultural labor from those who are not must be drawn very closely. See Batt v. Unemployment Compensation Div., 63 Idaho 572, 123 P.2d 1004, 139 A.L.R. 1157 (1942); and Smythe v. Phoenix, 63 Idaho 585, 123 P.2d 1010 (1942). Although we might agree that the processing plant worker is as much in need of unemployment insurance as other workers, the same could be said of all agricultural workers. The logic of exempting agricultural labor from coverage of the Employment Security Law of the State of Idaho, I.C. Chapter 13, Title 72, in view of the broad declaration of state public policy contained in I.C. § 72–1302 escapes us; but so long as it exists, inequities between workers performing the same or similar tasks under the same or similar conditions must persist. However, this can be alleviated only by the legislature—not the judiciary.

The order of the Industrial Accident Board is affirmed. Costs to respondent.

McFADDEN, C. J., and McQUADE, DONALDSON and SHEPARD, JJ., concur.