RENDERED: APRIL 29, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0167-WC

BROWNWOOD PROPERTY, LLC                                   APPELLANT


                    ON APPEAL FROM COURT OF APPEALS
V.                         NO. 2019-CA-001376
                    WORKERS' COMPENSATION BOARD
                         NO. WC-18-92452


SHEENA THORNTON;                                          APPELLEES
UNINSURED EMPLOYERS' FUND;
JEFF V. LAYSON III, ADMINISTRATIVE
LAW JUDGE; AND
KENTUCKY WORKERS' COMPENSATION
BOARD


**OPINION OF THE COURT BY JUSTICE LAMBERT**

**REVERSING AND REMANDING**

Brownwood Property, LLC (Brownwood) challenges the Court of Appeals'

holding that its employee, Sheena Thornton (Ms. Thornton), was not a "person

employed in agriculture" under Kentucky's Workers' Compensation Act. After

thorough review, we reverse.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Ms. Thornton sought workers' compensation benefits for an injury she

sustained while working on farmland owned by Brownwood in Jessamine

County (the farm). The Administrative Law Judge (ALJ) bifurcated the claim

proceedings to determine whether the agricultural exemption to workers'

compensation coverage applied to Ms. Thornton's claim, which is to be addressed herein.

Brownwood purchased the 420-acre horse farm in November of 2016. The evidence was undisputed that when Brownwood purchased the farm, it knew that the farm was zoned as agricultural and was subject to a conservation easement through the Bluegrass Land Conservancy. Under the conservation easement the land could never be used for anything other than agriculture.

The farm had fallen into significant disrepair in the three to six years preceding Brownwood's purchase of it. The farm's former owner, a long-time breeder and owner of thoroughbred horses, suffered from Alzheimer's Disease which rendered her unable to properly care for the property. Brownwood purchased the farm with the intent to restore it to working condition and to use it primarily as a thoroughbred horse farm. Due to the farm's dilapidated state, there was no livestock on the farm, nor any crops being grown apart from hay when the farm was purchased; the same was true when Ms. Thornton's injury occurred. By the time depositions were taken in this case in late 2018, the farm had been fully restored and housed thirty to forty thoroughbreds.

Thomas Biederman (Mr. Biederman) is a real estate broker that specializes in horse farm properties. Mr. Biederman testified via deposition that he was retained by the owner of Brownwood to purchase the farm and "consult with [Brownwood's owner] on getting the property back into condition

for [the owner's] intended purpose, which was farming and raising horses and raising cattle."

Ms. Thornton's husband, Wesley Thornton (Mr. Thornton), had worked on the farm for thirteen to fourteen years prior to its acquisition by Brownwood.  After Brownwood purchased the farm, Mr. Biederman hired Mr. Thornton to aid in its restoration.  Mr. Thornton's duties included painting barns, cleaning out barns, cleaning out tack rooms, etc.  As a term of Mr. Thornton's employment, he was permitted to stay in one of the seven houses on the farm, and Ms. Thornton lived on the farm with him.

About two weeks after hiring Mr. Thornton, Mr. Biederman noticed that Ms. Thornton was helping Mr. Thornton with his duties.  Mr. Biederman told the foreman that supervised Mr. Thornton that he was uncomfortable with Ms. Thornton helping Mr. Thornton "because of her apparent lack of physical disposition to do the work," and instructed the foreman to no longer allow her to work on the farm.  Eventually, after Mr. and Ms. Thornton "bugged [him] every single day for about a month," Mr. Biederman hired Ms. Thornton to work on the farm.  Mr. Biederman testified:

> I ultimately said that if she wanted to work...she could mow because I know that it doesn't take a lot of physical attributes to get on the mower, and that's what she wanted to do was mow, and that she could keep the workplace clean.  There was a house that we were using for employees to gather, and she was to pick up trash, clean those things, and be a support staff to [Mr. Thornton and the foreman], and to ride the lawn mower.

Mr. Biederman described Ms. Thornton's duties and the concomitant time she spent performing them as follows:

3

**Q.** Did you observe her working on the farm during the period of time that she was employed there?

**A.** Yes.

**Q.** Do you have an estimate as to the percentage of time she spent on the mower as opposed to being in a house doing cleaning work?

**A.** And it was not just houses; it was barns. She was cleaning tack rooms; she was helping to—the whole place needed clearing up. So I would say 70 to 80 percent on the mower and 20 to 30 percent on the cleaning-up part.

**Q.** Can you distinguish percentages between working in the barns and cleaning up that area as opposed to the houses?

**A.** I would say ten percent in the houses part. And again, it was in rough condition, so we were just trying to get it so we could work on it.

**Q.** So is it your testimony then that approximately 90 percent of her time was either mowing the farm or working in the barns to get them ready for animals?

**A.** Yes, I would. Part of that is also to—cleaning the office where the men gathered in the morning to get their instructions. She was to keep that neat and clean.

Ms. Thornton also testified via deposition regarding her job duties and what her typical work week entailed. She stated that her job duties were to clean the guest house, empty humidifiers in the guest house and "the big house,"[1] and to mow. She testified that she worked Monday through Thursday for thirty hours per week.

---

[1] The big house was apparently the main residence on the farm, but was designated as a historical site and therefore could not be remodeled. No one was living in it during the time relevant to this case.

On Mondays or Tuesdays, she would clean the guest house from 7 a.m. until lunch.  There were seven residences on the property, but she only cleaned the guest house as it was the only house that had been fully remodeled at that time, although no one was yet living in it.  After cleaning the guest house on Monday or Tuesday, she would typically mow in the afternoon.  When asked why it took her five hours a day to clean the guest house when no one was living it in, she replied:

> Because there was (sic) always workers coming in and out of there. Some of the construction workers were still there, trying to clean up and do different things.  And some of the guys that worked on the farm would go in and out to do things, so I had to clean up the floors, the mud and stuff that they would track in on their feet.

She then further elaborated on what her cleaning duties entailed:

> I'd mop the floors, and I'd wipe down the countertops and the cabinets from then (sic) sawdust and go through the bathrooms and clean the toilets and the sinks and mirrors and stuff like that. And also, the owners[2] was (sic) bringing in supplies and stuff, and I would have to put their dishes away and put their linens and décor, furniture, and stuff like that away, too, as they brought that in.

Ms. Thornton said that, in addition to mowing in the afternoon on Monday and Tuesday, she also mowed for most of the day on Wednesdays and Thursdays.  On Wednesdays and Thursdays, she began mowing at 7 a.m., took a lunchbreak at noon, and then continued mowing until 3 or 4 p.m.  Regarding the areas she mowed, she said:

> I maintained the yards of the houses, and if I got that done, then I would go around some of the fence lines and mow that so they

_____

[2] She subsequently confirmed that the owners were not living in the guest house at that time.

5

could mow it and look good...I mainly mowed the houses, the yards of the houses, about three yards on the back side of the farm and the yards on the other side, on the front side of the farm. And I always mowed down the lane to the front gate.

In addition to cleaning the guest house and mowing, she cleaned the humidifiers in the guest house and the big house every day, which took about five to ten minutes. Occasionally, she had to clean up water in the guest house basement from a defective sump pump, which she estimated would take about an hour. A succinct recap of her work week was provided during her deposition:

> **Q.** So what I'm trying to do is figure out where you spent your 30 hours each week. We know that Wednesday and Thursday, you would spend seven or eight hours mowing, correct?
>
> **A.** Correct.
>
> **Q.** So that's somewhere between 14 and 16 hours. That leaves us somewhere between 14 and 16 hours. So the guest house would normally take five hours to clean, one day a week?
>
> **A.** Right.
>
> **Q.** So that's five. And then to clean the humidifier in the guest house and soak up [water from the sump pump] if you need to, take maybe two hours a week, maximum?
>
> **A.** Yes.
>
> **Q.** And to empty the humidifier you said five to ten minutes max, so 30 minutes a week?
>
> **A.** Correct.
>
> **Q.** So other than what I have stated, you said you worked in the afternoons on Monday and Tuesday, mowing in the afternoons sometimes?
>
> **A.** Yes.

6

**Q.** So the rest of your week, other than what you've identified in the house, would be mowing in the afternoon?

**A.** Correct.

On the day she was injured, July 17, 2017, Ms. Thornton emptied the humidifiers in the guest house and the big house. She then rode in a pickup truck with another Brownwood employee to "the shop" on the back side of the property. As she was getting out of the truck, her foot hit a large rock and she fell to the ground, dislocating her foot. She was immediately taken to the hospital, her foot was set, and surgery was performed less than a week later. Tragically, her bones were reset incorrectly during surgery, causing her foot to be "obviously misshapen" after the cast was removed. "[H]er toes were deformed and down [and she] was unable to place weight on her foot in an appropriate manner." A three-month attempt to help the situation with physical therapy was unsuccessful. Her treating physicians advised her that they could either surgically rebreak her foot and attempt to reset it properly or it could be amputated "mid-calf about 6-7 cm below the knee." She chose the latter and now has a prosthesis.

Ms. Thornton later filed a workers' compensation claim against Brownwood. Brownwood did not have workers' compensation insurance at the time of her injury. One of the appellees, Uninsured Employers' Fund (UEF), was therefore joined as a defendant. Brownwood asserted that it was not required to pay any benefits to Ms. Thornton because of the exemption for agricultural employers under Kentucky's Workers' Compensation Act (Chapter 342). Specifically, Brownwood argued that (1) Brownwood was an employer

7

solely engaged in agriculture under KRS[3] 342.630(1); and that (2) Ms. Thornton was a person employed in agriculture under KRS 342.650(5). The ALJ agreed with Brownwood and found: (1) that Brownwood was an agricultural employer; and (2) that Ms. Thornton was an agricultural employee. The ALJ therefore dismissed her claim. Ms. Thornton then appealed to the Workers' Compensation Board (the Board).

The Board affirmed the ALJ's finding that Brownwood was an agricultural employer, but reversed its finding that Ms. Thornton was an agricultural employee. Brownwood thereafter appealed the Board's holding to the Court of Appeals. The Court of Appeals upheld the Board. It agreed that Brownwood was an agricultural employer, and that Ms. Thornton was not an agricultural employee. Brownwood now appeals the Court of Appeals' decision to this Court.

Additional facts are discussed below as necessary.

## II.    ANALYSIS

The Court of Appeals reviews decisions of the Board with the purpose of "[correcting] the Board only where the Court perceives the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice."[4] Subsequent review of the Court of Appeals and the Board by this Court is meant "to address new or novel questions of statutory construction, or to

---

[3] Kentucky Revised Statute.

[4] *W. Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687–88 (Ky. 1992).

8

reconsider precedent when such appears necessary, or to review a question of constitutional magnitude."[5]

The facts of this case are by and large not in dispute. The sole issue is one of statutory interpretation, i.e., whether Ms. Thornton was an agricultural employee within the meaning of Chapter 342. We will therefore conduct a *de novo* review, giving no deference to the decisions below.[6]

In Kentucky, an employer engaged solely in agriculture is not subject to the requirements of Chapter 342, including the purchase of workers' compensation insurance to cover its employees in the event they are injured. KRS 342.630(1) provides: "The following shall constitute employers mandatorily subject to, and required to comply with, the provisions of this chapter: Any person, **other than one engaged solely in agriculture**, that has in this state one (1) or more employees subject to this chapter."[7]

The parties do not dispute that Brownwood was an employer engaged solely in agriculture at the time of Ms. Thornton's injury. Therefore, the question we are tasked with addressing is whether Ms. Thornton was a person employed in agriculture at the time of her injury. To that end, KRS 342.650(5) states: "The following employees are exempt from the coverage of this chapter: **Any person employed in agriculture**[.]"[8] In turn, "agriculture" is defined as:

---

[5] *Id.* at 688.

[6] *See, e.g., Ford Motor Co. v. Jobe*, 544 S.W.3d 628, 631 (Ky. 2018).

[7] (Emphasis added).

[8] (Emphasis added).

9

the operation of farm premises, including the planting, cultivation, producing, growing, harvesting, and preparation for market of agricultural or horticultural commodities thereon, the raising of livestock for food products and for racing purposes, and poultry thereon, **and any work performed as an incident to or in conjunction with the farm operations**, including the sale of produce at on-site markets and the processing of produce for sale at on-site markets. It shall not include the commercial processing, packing, drying, storing, or canning of such commodities for market, or making cheese or butter or other dairy products for market[.][9]

In this case, the ALJ found that Ms. Thornton was an agricultural employee under Chapter 342. The ALJ stated in its "Discussion, Analysis, and Findings":

The unrebutted evidence in this case confirms that Brownwood purchased the property in Jessamine County for no other purpose than operating a thoroughbred horse farm. In fact, when it bought the farm, Brownwood was aware of the conservation easement which prohibited use of the property for any other purpose besides farming. The fact that there were no livestock or crops actually being raised on the farm at the specific time which Ms. Thornton was injured was because the farm was in very poor condition when it was purchased and needed to be rehabilitated so that Brownwood could carry out its intended purpose. This included such activities as cleaning the various structures and mowing the grass. **The [ALJ] believes that these activities qualify as 'work performed as an incident to or in conjunction with the farm operations**.' As a consequence, the [ALJ] finds...that Ms. Thornton was a 'person employed in agriculture' as contemplated by KRS 342.650(5).[10]

The Board reversed the ALJ and held that Ms. Thornton was not an agricultural employee, and the Court of Appeals affirmed the Board.

Brownwood argues that the Court of Appeals erred in upholding the Board for

---

[9] KRS 342.0011(18) (emphasis added).

[10] (Emphasis added).

two reasons.  First, Brownwood argues that the Court of Appeals applied the wrong analysis; it advocates for a test requiring that, once an employer is found to be an agricultural employer, all of its employees must be considered *per se* agricultural employees.  In other words, under Brownwood's proposed interpretation of the applicable statutes, once it was found to be an agricultural employer, Ms. Thornton had to automatically be considered a person employed in agriculture.  Or, in the alternative, Brownwood argues the Court of Appeals erred by holding that Ms. Thornton was not an agricultural employee.  It asserts that Ms. Thornton meets the definition of an agricultural employee because her work on the farm was "incident to or in conjunction with the [farm's] operations[.]"  UEF likewise asserts that Ms. Thornton's work for the farm was agricultural under the same language from the definition.  We will address each argument in turn.

We cannot adopt Brownwood's proposed statutory interpretation.  If the General Assembly had intended for all employees of an agricultural employer to automatically be considered agricultural employees, it could have written the agricultural exemption in Chapter 342 that way.  Instead, KRS 342.630(1) exempts employers engaged solely in agriculture, while KRS 342.650(5) exempts any person employed in agriculture.  That Chapter 342 provides separate exemptions for employers and employees suggests that our General Assembly intended for them to be addressed as distinct issues.

In addition, Brownwood's suggested interpretation conflicts with existing case law.  For example, in *Homestead Family Farm v. Perry*, the employer was

11

undisputedly an agricultural employer, but the Court of Appeals nonetheless went on to address whether the employee was a person employed in agriculture.[11]  We therefore decline to adopt Brownwood's proposed interpretation and find no fault with the Court of Appeals for rejecting it.

However, we agree with Brownwood's and UEF's argument that the Court of Appeals erred in holding that Ms. Thornton's employment for Brownwood was not agricultural.  We hold that the Court of Appeals and the Board applied an incorrect, non-statutory standard, and that Ms. Thornton was a person employed in agriculture because her work was work "performed as an incident to or in conjunction with the [farm's] operations."[12]

To begin, we agree with Brownwood's and UEF's argument that the Board and the Court of Appeals applied an inappropriate standard to the facts of this case.  The Board held that Thornton was not an agricultural employee because "she was not primarily engaged in agricultural activities" and that she "was not employed to regularly perform tasks typically considered agricultural in nature."  Similarly, a split Court of Appeals held that Ms. Thornton "was hired in a non-agricultural capacity and her tasks consisted of activities not normally associated with agriculture."[13]  But the definition of agriculture under Chapter 342 does not require that the work performed by an employee be

---

[11] 506 S.W.3d 325, 329 (Ky. App. 2016) (discussing whether the employee's work was commercial or agricultural in nature).

[12] KRS 342.0011(18).

[13] *Brownwood Property, LLC v. Thornton*, No. 2019-CA-001376-WC, 2020 WL 1815986, at *4 (Ky. App. Apr. 10, 2020) (Caldwell, J., dissenting).

12

normally associated with agriculture.  Rather, KRS 342.0011(18) explicitly includes "**any** work **incident to or in conjunction with** the [farm's] operations" in the definition of agriculture.[14]  Under the facts of this case, this is the definition that should have been applied in the lower proceedings.

Preliminarily, we note that the definition of agriculture under Chapter 342 is intentionally broad.  It has been established for many years that "[t]he term 'agriculture' used in the Kentucky [Workers' Compensation] Act supplies a boundary which is broader, in many instances, than that employed by other states and certainly equal to the most liberal."[15]

Further, we must look at the "whole character" of an individual's employment to determine whether they were employed in agriculture.  For example, in the 1960 case *Bob White Packing Co. v. Hardy*, the Court of Appeals held that "[n]either the pending task nor the place where it is being performed is the test.  The whole character of the employment must be looked to to determine whether he is a farm laborer."[16]  This standard was recently re-affirmed by the Court of Appeals in *Perry*, which stated that "it was not just the nature of the work which the employee was doing at the time of the injury that determined coverage, but that the whole character of the employment should

---

[14] (Emphasis added).

[15] *Robinson v. Lytle*, 124 S.W.2d 78, 80 (Ky. 1938).

[16] 340 S.W.2d 245, 247 (Ky. 1960) (quoting *Guse v. Wessels*, 270 N.W. 665 (Neb. 1937)).

be considered in determining whether a person was employed in agriculture."[17] With this standard in mind, we now address whether Ms. Thornton's employment was "any work performed incident to or in conjunction with the [farm's] operations" under KRS 342.0011(18).

When interpreting a statute, this Court must always seek to give effect to the intent of the General Assembly.[18] We do this, "if at all possible, from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration."[19] Here, it chose to define agriculture as, inter alia, "any work performed as an incident to or in conjunction with the farm operations." Neither "incident to" nor "in conjunction with" has a definition under Chapter 342. We therefore note that "incident to" means "[d]ependent on, subordinate to, arising out of, or otherwise connected with (something else, usu. of greater importance)"[20] While "in conjunction with" means "the state of being conjoined,"[21] i.e., "being, coming, or brought together so as to meet, touch, overlap, or unite[.]"[22]

---

[17] *Perry*, 506 S.W.3d at 329 (quoting *Fitzpatrick v. Crestfield Farm, Inc.*, 582 SW.2d 44 (Ky. 1978)).

[18] *See, e.g.*, *Seiller Waterman, LLC v. RLB Properties, Ltd.*, 610 S.W.3d 188, 203 (Ky. 2020) (quoting *Shawnee Telecom Res., Inc. v. Brown*, 354 S.W.3d 542, 551 (Ky. 2011)).

[19] *Id.*

[20] *Incident*, *Black's Law Dictionary* (11th ed. 2019).

[21] *Conjunction*, Merriam-webster.com, https://www.merriam-webster.com/dictionary/conjunction ( last accessed March 24, 2021).

[22] *Conjoined*, Merriam-webster.com, https://www.merriam-webster.com/dictionary/conjoined (last accessed March 24, 2021).

With that noted, we now address the "whole character" of Ms. Thornton's employment. While not dispositive, Ms. Thornton was working for an employer engaged solely in agriculture on farmland that was used solely for an agricultural purpose. It was undisputed that when Brownwood purchased the farm it had to be restored before it could return to being a fully functioning horse farm. Therefore, all of Ms. Thornton's work was performed as part of the overall effort of all of Brownwood's employees to restore the farm. Thus, her work, whether mowing or cleaning, was incident to or in conjunction with the farm's operations. In addition, we agree with the well-reasoned dissent of Judge Caldwell from the Court of Appeals. Judge Caldwell would have held that Ms. Thornton's employment was agricultural. She reasoned that

> Thornton…had duties which included cleaning the guesthouse and tack room, and mowing yards, lanes, and the farm entrance. While Thornton's job duties are such that they can be associated with working for a commercial lawn service or 'Molly Maid' type business, they are also essential to the operation of a farm…[T]he duties Thornton was employed to perform are clearly 'incident' to a fully functioning farm. Given the nature of farming, which typically involves early morning and late-night care and feeding of animals and attention to crops, safely navigable yards, lanes, and entries are necessary. If houses on a farm are meant for habitation by the farmworkers (such as in this case where the workers live on the farm), then they must be maintained and mowed. So, too, the lanes and fencerows. Workers, livestock, equipment, and vehicles cannot use them if they are not maintained and mowed. Barns and tack rooms cannot be safely accessed and utilized in agricultural pursuit if not cleaned and maintained. To find that Thornton's cleaning, mowing, and maintenance was distinct and separate from any farming activity is to ignore what is necessary and integral to the function of a farm.[23]

[23] *Thornton*, 2020 WL 1815986, at *5.

15

Consequently, when looking at the "whole character" of Ms. Thornton's employment, we hold that it was work performed incident to or in conjunction with Brownwood's farm operations. She was therefore a person employed in agriculture within the meaning of KRS 342.650(5) and KRS 342.0011(18), and she is not entitled to worker's compensation benefits under Chapter 342.

## III. CONCLUSION

Based on the foregoing, we reverse. This case is hereby remanded and the ALJ's original opinion dismissing Ms. Thornton's claim shall be reinstated.

All sitting. All concur.

COUNSEL FOR APPELLANT, Brownwood Property, LLC

Susan Yuk Wo Chun
Thomas Walcutt Miller
Miller, Griffin, & Marks, P.S.C.

COUNSEL FOR APPELLEE, Sheena Thornton:

Charles William Gorham
The Law Office of Charles W. Gorham

COUNSEL FOR APPELLEE, Uninsured Employers Fund:

James Robert Carpenter
Assistant Attorney General

COUNSEL FOR APPELLEE, Workers' Compensation Board:

Michael Wayne Alvey
Executive Director

ADMINISTRATIVE LAW JUDGE:

Hon. Jeff V. Layson, III